UNITED STATES of America,
Plaintiff–Appellee,

v.

Lenin M. JEREZ and Carlos M. Solis,
Defendants–Appellants.

Nos. 95–1549, 95–1562.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1995.

Decided Feb. 27, 1997.

Rehearing and Suggestion for Rehearing
En Banc Denied May 19, 1997.

Pamela Pepper (argued), Office of the United States Atty., Milwaukee, WI, for U.S.

Douglas M. Bihler, Bihler & Kuehl, Milwaukee, WI, for Lenin M. Jerez.

Mark E. Kershek (argued), Kershek & Kershek, Milwaukee, WI, for Carlos M. Solis.

Before COFFEY, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Lenin Jerez and Carlos Solis pleaded guilty to possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Prior to entering the pleas, Mr. Jerez and Mr. Solis filed motions to suppress the cocaine which formed the basis of the charges on the ground that its seizure violated the Fourth Amendment. The district court denied the motions. Pursuant to their conditional plea agreements, Mr. Jerez and Mr. Solis now appeal the district court's denial of their motions to suppress. For the reasons set forth in the following opinion, we reverse the judgment of the district court.

## I

## BACKGROUND

### A. Facts

On September 26, 1994, Deputy Sheriffs Donald Hurrle and Daniel Lent were patrolling the area around Mitchell Field International Airport in Milwaukee County, Wisconsin. Both officers were assigned to the drug interdiction unit, the purpose of which was to prevent the entry of illegal drugs into Milwaukee County. The officers were looking for "target vehicles" from "source states." "Target vehicles" are vans or two-door vehicles. Deputy Hurrle testified that such vehicles are favored by drug couriers. "Source states" include California, Texas, Florida and Arizona. These states are considered to be a locus of drug trafficking.

At around 7:25 p.m., Deputies Hurrle and Lent noticed a two-door, white 1988 Honda Prelude with Florida license plates in the parking lot of a Quality Inn near the airport. Because the two-door car from Florida was parked near the airport and the interstate, the officers believed that the car might be involved in drug trafficking. Seeking more information about the car, Deputy Hurrle used his radio to request the Sheriff's Department to run the license plate number through its computer. The check revealed that the car was not stolen and was registered to Carlos M. Solis of Miami, Florida. The officers then entered the motel to ask the staff at the front desk some questions about Mr. Solis. They learned that Mr. Solis was a registered guest at the motel and was staying in Room 161 with another individual.

Deputies Hurrle and Lent proceeded from the motel to the Sheriff's Office at the airport to obtain more information about Mr. Solis, including whether Mr. Solis had a criminal history and whether he was wanted in any other jurisdiction. Their computer investigation revealed that Mr. Solis' Florida driver's license was suspended and that he had been arrested in August 1994 for smuggling contraband into the Dade County Jail.[1] The investigation did not reveal why the driver's license was suspended or what type of contraband Mr. Solis had been accused of smuggling into the jail. Mr. Solis had no extraditable felony warrants.

At around 8:30 p.m., after responding to another call, the officers returned to the Quality Inn. Deputy Hurrle, at the suppression hearing, stated that the reason for returning was that the deputies "hope[d they] could get a consent search" by knocking on the door of Mr. Solis' motel room. Tr. at 34. Because Mr. Solis' car was no longer in the parking lot when they arrived, the officers instead decided to set up surveillance of the area. Deputies Hurrle and Lent proceeded to maintain a look-out of the parking lot for more than two hours, during which time they saw no sign of the Honda. At 10:45 p.m., close to the officers' 11:00 p.m. "quitting time," the deputies returned to the airport office to complete their activity reports for the day and to fax the reports to the central office of the Sheriff's Department.

---

1. The record is unclear as to whether the criminal background check revealed an arrest or conviction for smuggling contraband into the jail. Deputy Lent testified that the background check revealed a conviction, but Deputy Hurrle testified that it showed an arrest. Counsel for the appellants states that Mr. Solis did not have a conviction but an arrest that had not been processed.

On the way home just after 11 p.m., Deputy Lent drove past the Quality Inn and noticed that Mr. Solis' white Honda was again in the parking lot. He contacted Deputy Hurrle to relay the sighting and to request that Deputy Hurrle meet him in the parking lot. About five minutes later, Deputy Hurrle arrived and, along with Deputy Lent, proceeded into the hallway of the motel towards Room 161.

At around 11:05 or 11:10 p.m., when the two officers arrived at Room 161, the room was "quiet"; no sounds were heard coming from the room. Tr. at 38. Nevertheless, the deputies "immediately knocked on the door for several minutes, getting no response." Tr. at 79. The deputies took turns knocking. Deputy Lent testified that, after Deputy Hurrle "initiated the knocking" and "got no response," he (Deputy Lent) "then knocked on the door for a period of approximately three minutes." *Id.* When Deputy Lent was asked at the suppression hearing whether the officers had knocked "[t]he whole three minutes," he responded, "Intermittently, between myself and Detective Hurrle, yes." *Id.*[2] At some point during the knocking, one of the deputies spoke in the direction of the door, "Police. Open up the door. We'd like to talk to you." Tr. at 93.

Dissatisfied with the lack of response and convinced that the room's occupants, though hearing the knocks, were "voluntarily" ignoring them, *id.*, Deputy Hurrle decided to go outside and knock on the window of Room 161. At the suppression hearing, Deputy Lent explained this decision and the persistence of the officers: "[O]ur reasons for sticking around were—and for proceeding to knock on the window were—[it] was beginning to be a late hour. [The p]eople [in the motel room were] from a strange city. [They m]ay in fact feel threatened if someone comes and knocks at the door, [at a] late hour. That's [also] why we proceeded to present ourselves as officers." *Id.* Deputy Hurrle wanted to "see if he could get a response[, v]ia the window versus the door." Tr. at 94.

Deputy Hurrle exited the motel and walked around to the window of Room 161 while Deputy Lent "continued to stand by at the door and continued to knock." Tr. at 80. Deputy Hurrle then "began knocking on [the room's window] while [Deputy] Lent continued knocking on the door." Magistrate Judge's Recommendation at 3. The knocking on the window was loud enough for Deputy Lent to hear it from where he was knocking. Despite the commotion, there was no immediate response from the room. Finally, after Deputy Hurrle had "knock[ed] on the window for approximately one-and-a-half to two minutes," Deputy Lent heard movement inside Room 161. Tr. at 94.

Deputy Hurrle testified that, after he knocked on the window "a couple of times," he saw, through a small opening in the window's drapes, Mr. Jerez' face as he lay in the bed. Tr. at 44, 46. The deputy directed light from his flashlight into the room in order to make this observation. With the aid of the flashlight, Deputy Hurrle saw Mr. Jerez move under the covers. Soon thereafter, Mr. Solis opened the drapes to see Deputy Hurrle standing in front of the window. The deputy was wearing a windbreaker-type jacket with a law enforcement emblem and lettering, "Drug Enforcement Unit, Milwaukee County Sheriff's Department." Tr. at 47. Deputy Lent testified that, from where he was standing, he heard Deputy Hurrle address Mr. Solis, "Sheriff's Department. Can we talk to you? Would you open up the door?" or with words to that effect. Tr. at 95. Deputy Hurrle testified that Mr. Solis shook his head "yes" in response.

When Deputy Hurrle returned to the inner hallway, Mr. Solis, clothed only in his underwear, was opening the door. The room behind him was dark. The officers identified themselves, displayed their badges, and asked if they could speak with him. Mr. Solis "said sure, or words to that [e]ffect." Tr. at 82. As Mr. Solis proceeded to open the door further, the officers asked if they could come in and talk. Mr. Solis told the officers that they could and opened the door.

---

2. Deputy Hurrle testified that the officers did not "continue pounding" on the door for the entire three minutes, but that they did knock on the door "[o]n and off" during the entire three-minute period. Tr. at 16. The district court found that the deputies "knocked on the door for several minutes without a response." Order at 3.

Upon entering the room, the deputies noticed a half-smoked marijuana cigarette lying on top of the television. Asked what it was, Mr. Solis replied, "That's all we've got." . Tr. at 21. Deputy Hurrle then asked Mr. Jerez, who was still in bed, if he would get up and speak with them. Once Mr. Jerez was out of the bed, the deputies proceeded to interrogate the appellants. In response to the questions, Mr. Solis said that they were from Miami and were in Milwaukee on vacation. He also said that they had come to Milwaukee to visit relatives. When pressed by the officers, neither appellant was able to supply the names or addresses of the relatives whom they might be visiting.

Following this exchange, Deputy Hurrle asked if there was anything illegal in the room. The appellants said "no." Apparently carrying out the plan to "get a consent search," the officers then asked if they could look through the appellants' room and belongings. Mr. Solis and Mr. Jerez both gestured that a search would be acceptable, stating that they had nothing that they should not have. Deputy Lent then asked the two to step away from the beds and to move towards the bathroom area. Deputy Hurrle picked up a nylon suitcase from the floor and placed it on the bed. Deputy Lent asked the appellants "whose suitcase Detective Hurrle had at that moment." Tr. at 88. In response, "Mr. Jerez more or less raised his hand and indicated that it was his suitcase." *Id.* "Detective Hurrle then proceeded to move the bag into a position to begin a search." *Id.* Deputy Lent "then turned to Mr. Jerez and asked him at that time, '[D]o you mind if my partner looks through your bag'?" *Id.* When Mr. Jerez nodded his head "sure," Deputy Hurrle unzipped the bag to find a package bound with green plastic tape. The package contained a substance that looked and smelled like cocaine.

Upon discovering the package, Deputies Hurrle and Lent drew their weapons and ordered the appellants to the floor, where they were handcuffed. A subsequent search through the remaining bags yielded an additional kilogram-sized package in Mr. Jerez' bag and a third package in a separate gym bag belonging to Mr. Solis. The officers then informed the appellants that they were under arrest for possession of a controlled substance with intent to deliver. After being read their Miranda rights, both appellants stated that the cocaine belonged to them and that they had brought it up from Miami. Mr. Jerez and Mr. Solis stated that their plan was to deliver the cocaine to unnamed individuals in Milwaukee and to return to Miami to receive $2,000 each.

### B. *Proceedings in the District Court*

Mr. Jerez and Mr. Solis were indicted for possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). The appellants filed motions to suppress the evidence obtained during the search of the motel room on the ground that the search violated the Fourth Amendment because the officers neither had a warrant nor consent to search the room. The motions were assigned to a magistrate judge, who held an evidentiary hearing. After the hearing, the magistrate judge recommended the motions be denied.

The magistrate judge reasoned that the knocking on the appellants' door and window did not amount to a *Terry* stop for which reasonable suspicion was required. The event instead was found to be a voluntary encounter, similar to those situations in which law enforcement officers approach a citizen in an airport, in a bus terminal or on the street. Even assuming arguendo that knocking on the door required some justification, the magistrate judge found that Deputies Hurrle and Lent had "adequate justification," albeit not necessarily "reasonable suspicion," to knock on the door and window: The white Honda was a two-door car from Florida (a "target" vehicle); the deputies knew that Mr. Solis had been arrested for smuggling some sort of contraband into a jail; they knew Mr. Solis was registered at the motel; and they had reason to believe that he was in the room. Finally, the magistrate judge found that the appellants voluntarily consented to the officers' entering their motel room and searching their bags.

The district court accepted the magistrate judge's recommendation and denied the motions. In its order, the court specifically agreed with the magistrate judge that the initial encounter between the deputies and

the appellants did not constitute a seizure and that the subsequent search followed the appellants' voluntary consent.

Once their suppression motions were denied, Mr. Jerez and Mr. Solis pleaded guilty, pursuant to plea agreements in which they reserved the right to appeal. Mr. Jerez and Mr. Solis now appeal the denial of their motions to suppress.

## II

### DISCUSSION

#### A. Seizure

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. Of course, not all police encounters with the citizenry are Fourth Amendment seizures. In *Terry v. Ohio*, the Supreme Court noted, "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). The appellants claim that the officers' knocking on their motel room's door and window and shining a flashlight through the room's window amounted to such a restraint on their liberty.

■ The Supreme Court has formulated two approaches for determining whether a person has been "seized" within the meaning of the Fourth Amendment. The first of these approaches is employed when the police approach an individual in a place such as an airport, train terminal or on the street. As a general matter, law enforcement officers may approach a willing individual in a public place and ask that person questions without violating the Fourth Amendment. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Notorianni*, 729 F.2d 520, 522 (7th Cir.1984). In these situations, a "seizure" of the person occurs only if a reasonable person in similar circumstances would not have felt "free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)); *United States v. Boden*, 854 F.2d 983, 991 (7th Cir.1988).

■ The second approach articulated by the Supreme Court applies when the police approach an individual in a confined space such as a bus. In such a situation, it no longer "makes sense to inquire whether a reasonable person would feel free to continue walking." *Florida v. Bostick*, 501 U.S. 429, 435, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991). Because a person on a bus or in an otherwise confining space "has no desire to leave" and would wish to remain even if police were not present, "the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter." *Id.* at 435–36, 111 S.Ct. at 2387. When a person's "freedom of movement [is] restricted by a factor independent of police conduct—*i.e.*, by his being a passenger on a bus ..., the appropriate inquiry is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." *Id.* at 436, 111 S.Ct. at 2387; *Chesternut*, 486 U.S. at 576, 108 S.Ct. at 1981 (seizure occurred if "respondent could reasonably have believed that he was not free to disregard the police presence and go about his business").[3]

---

3. *See United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir.1995) ("If a reasonable person would have felt free to disregard the police and go about his business, the encounter is consensual.") (citations omitted); *Boden*, 854 F.2d at 991 ("There is no 'seizure' subject to the Fourth Amendment unless a reasonable person in Boden's position would have believed that he was not free to ignore Agent Oitker (and the other agents) and continue on his way; the test is objective."); *Notorianni*, 729 F.2d at 522 ("[T]he accosted individual would not be deemed to have been seized within the meaning of the Fourth Amendment unless a reasonable person in his position would have believed that he was not free to ignore the agents and continue on his way."); *United States v. Black*, 675 F.2d 129, 134–35 (7th Cir.1982) ("Thus, if officers have intimidated an individual through the use of a show of authority sufficient to make it apparent that the individual is not free to ignore the officer[s] and proceed on his way, a seizure will be found."), *cert. denied*,

■ This second formulation is the appropriate analytical approach in this case. Mr. Jerez' and Mr. Solis' movements were confined as a natural result of their voluntary decision to stay in the motel. It was the middle of the night and at least one of them was clad only in his underwear. As a practical matter, they could not have expressed their desire to terminate the encounter with the police by leaving the scene. Like the person seated on the bus in *Bostick*, a person staying in a motel room has no desire to leave and would remain whether police were present or not. Mr. Jerez and Mr. Solis, therefore, were "seized" within the meaning of the Fourth Amendment if a reasonable person would not have felt free to decline Deputies Hurrle's and Lent's requests to open the door or to otherwise ignore the deputies' presence. The test, as with the "free to leave" formulation, is an objective one and requires a contextual approach. *United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir.1995); *Notorianni*, 729 F.2d at 522. The determination of whether an encounter is a seizure is made on the basis of the "totality of the circumstances" surrounding the encounter. *Bostick*, 501 U.S. at 437, 111 S.Ct. at 2388; *Chesternut*, 486 U.S. at 572–73, 108 S.Ct. at 1979. We hold that, under the totality of the unique circumstances of this case, a Fourth Amendment seizure occurred.

■ In making the assessment as to whether a seizure occurred, the circumstances must, of course, be assessed in terms of the values protected by the Fourth Amendment. Here, the district court, required to assess the totality of the circumstances, failed to consider adequately two significant factors: the place and the time of the encounter. The police confronted the

appellants in the middle of the night and sought admission to their dwelling place.[4] Our jurisprudence interpreting the Fourth Amendment has long recognized that police encounters at a person's dwelling in the middle of the night are especially intrusive. Indeed, the special vulnerability of the individual awakened at the privacy of his place of repose during the nighttime hours to face a nocturnal confrontation with the police was recognized in the common law that antedates our separation from England. *See Monroe v. Pape*, 365 U.S. 167, 210, 81 S.Ct. 473, 496, 5 L.Ed.2d 492 (1961) (Frankfurter, J., dissenting) ("Night-time search was the evil in its most obnoxious form."); 2 Matthew Hale, The History of the Pleas of the Crown 113 (1847); Thomas M. Cooley, Constitutional Limitations 430 (7th ed. 1903); *cf. Wilson v. Arkansas*, —— U.S. ——, ——, 115 S.Ct. 1914, 1916, 131 L.Ed.2d 976 (1995) (noting that the "knock and announce" principle of Fourth Amendment jurisprudence has roots in the common law that antedate the Constitution). *See generally* Fed.R.Crim.P. 41(c)(1); *Jones v. United States*, 357 U.S. 493, 498, 78 S.Ct. 1253, 1256–57, 2 L.Ed.2d 1514 (1958); *Frank v. Maryland*, 359 U.S. 360, 366, 79 S.Ct. 804, 808–09, 3 L.Ed.2d 877 (1959).[5]

Because our law and legal traditions long have recognized the special vulnerability of those awakened in the night by a police intrusion at their dwelling place, our Fourth Amendment jurisprudence counsels that, when a knock at the door comes in the dead of night, the nature and effect of the intrusion into the privacy of the dwelling place must be examined with the greatest of caution. Therefore, in recognizing the particular intrusiveness of nocturnal encounters with the police at one's dwelling, the courts of appeals have stressed the impact of such

---

460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983).

**4.** It is a well-established principle that the protection against unreasonable searches and seizures is not limited to one's home but extends as well to a person's privacy in temporary dwelling places such as hotel or motel rooms. *Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964); *United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 326, 136 L.Ed.2d 240 (1996);

*United States v. Rosario*, 962 F.2d 733, 736 (7th Cir.1992).

**5.** *Monroe v. Pape* and *Frank v. Maryland* have been abrogated, for reasons unrelated to the discussion in the text, by subsequent Supreme Court decisions. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (overruling *Monroe* ); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (overruling *Frank* ).

encounters on the individual dwelling there. For instance, our colleagues in the First Circuit have noted specifically that the reason for limiting nocturnal searches is to prevent "abrupt intrusions on sleeping residents in the dark." *United States v. Young*, 877 F.2d 1099, 1104 (1st Cir.1989) (Breyer, J.). Likewise, the Second Circuit has noted the "peculiar abrasiveness" of intrusions by law enforcement officials at night. *United States v. Ravich*, 421 F.2d 1196, 1201 (2d Cir.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970). And the Tenth Circuit, in *Harless v. Turner*, 456 F.2d 1337, 1338–39 (10th Cir. 1972) (citing *Villano v. United States*, 310 F.2d 680, 684 (10th Cir.1962); *United States v. Page*, 302 F.2d 81 (9th Cir.1962)), invalidated an individual's consent to search because it was obtained after the individual was "routed" out of bed in the middle of the night.

■ With this deeply-rooted principle in mind, we turn to the conduct of Deputies Hurrle and Lent on the night of September 26, 1994. The two deputies began the attempt to rouse the appellants by knocking on the door of a quiet motel room for three minutes, all the while getting no response. During this time, the deputies took turns knocking. They announced verbally that they were police and that they wanted the occupants to open the door. Deputy Lent testified that either he or Deputy Hurrle at some point commanded, "Police. Open up the door." "[T]here is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably,

at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law." *Davis v. United States*, 327 F.2d 301, 303 (9th Cir.1964).[6] The same does not hold true, however, when the knocking occurs in the middle of the night and lasts for three full minutes. See *id.* at 304 ("The time of day, coupled with the openness of the officers' approach …, rules out the possible dangers to their persons which might have resulted from a similar unannounced call in the dead of the night."); *United States v. Serna–Barreto*, 842 F.2d 965, 967 (7th Cir. 1988) (length of time is most important consideration in determining whether restraint is investigatory stop or full-fledged arrest). In this case, the intrusion did not occur until late at night after the appellants had retired. Mr. Jerez and Mr. Solis did not answer the door for the entire three minutes, notwithstanding the utterance of the command, "Open the door." The refusal to open the door continued for another minute or two even after Deputy Hurrle began knocking on, and shining a light through, the room's window. The three minutes of silence by Room 161's occupants, when combined with the other circumstances of this case, especially the lateness of the hour, amounted to a refusal by Mr. Jerez and Mr. Solis to answer the door.[7] Once the officers had been refused admittance, their continued efforts to rouse the occupants out of bed certainly prevented them from ignoring the continued requests and from maintaining the privacy and soli-

---

6. See also *United States v. Winsor*, 846 F.2d 1569, 1573 (9th Cir.1988) (en banc); *United States v. Roberts*, 747 F.2d 537 (9th Cir.1984); *Cuevas–Ortega v. INS*, 588 F.2d 1274 (9th Cir.1979). In those cases, the occupants voluntarily opened the door after a daytime knock. These cases, like *Davis*, simply hold that a voluntary response to a knock on the door during daytime hours does not implicate the Fourth Amendment. Notably, in *Winsor*, although the court noted that a mere knocking does not implicate the Fourth Amendment, it held the defendant had not opened the door voluntarily because, as in this case, the police commanded, "Police. Open the door." *Winsor*, 846 F.2d at 1571, 1573 n. 3 (citing cases) ("Compliance with a police 'demand' is not consent.") (internal quotations omitted).

7. See *United States v. Ramos*, 923 F.2d 1346, 1356 (9th Cir.1991) ("A failure to answer a knock and announcement has long been equated with a refusal to admit the search party…."). Indeed, in the context of "knock and announce" cases, courts routinely find that officers have been constructively refused admittance after only a few knocks. See *United States v. Moore*, 91 F.3d 96, 98 (10th Cir.1996) (noting that "[i]f the occupants do not admit the officers within a reasonable period of time, the officers may be deemed to be constructively refused admittance"); *Ramos*, 923 F.2d at 1355–56 (after two requests and forty-five seconds); *United States v. Wood*, 879 F.2d 927, 932–33 (D.C.Cir.1989) (after two requests and announcements).

tude of their dwelling. The deputies' persistence, in the face of the refusal to admit, transformed what began as an attempt to engage in a consensual encounter into an investigatory stop. *See United States v. Wilson,* 953 F.2d 116 (4th Cir.1991) (officer's prolonged and persistent questioning after defendant conveyed unwillingness to continue airport encounter transformed consensual encounter into Fourth Amendment seizure). The officers' persistence destroyed any possibility that the occupants could return to sleep and ignore the officers.

▮▮ In addition to the deputies' knocking on the room's only door for three minutes, Deputy Hurrle knocked on the room's only window for one-and-a-half to two minutes, loud enough that it could be heard from the interior hallway on the other side of the room. Wearing a windbreaker with a drug-related, law enforcement emblem, he then shone his flashlight through the small opening in the window's drapes, illuminating Mr. Jerez as he lay in the bed. This escalation of the encounter renders totally without foundation any characterization that the prolonged confrontation was a consensual encounter rather than an investigative stop. In *United States v. Packer,* 15 F.3d 654 (7th Cir.1994), for instance, we determined that the defendant had been seized when two police officers parked their cars on either side of the defendant's car and shone a "take down" light through the defendant's windows. When a person is in a confined area, encircling the area in an intimidating fashion contributes to a reasonable belief that ignoring the law enforcement presence is not an option. *See United States v. Pavelski,* 789 F.2d 485, 488 (7th Cir.) (finding that a reasonable person, "bounded on three sides by police patrol cars, would not have believed that he was free to leave"), *cert. denied,* 479 U.S. 917, 107 S.Ct. 322, 93 L.Ed.2d 295 (1986). Deputies Hurrle and Lent took additional actions beyond knocking on the door because they believed that, though "there was someone in the room," the "persons were just not responding to [their] knock[s]" and that the occupants were refusing to answer the door "voluntarily." Tr. at 93. By their own admissions, the deputies took these additional actions to produce a response in spite of the appellants' initial rebuff. "But if the person refuses to answer and the police take additional steps ... to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." *INS v. Delgado,* 466 U.S. 210, 216–17, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984).

▮▮ Simply stated, this is a case in which the law enforcement officers refused to take "no" for an answer. Their actions, when objectively assessed, "convey[ed] a message that compliance with their requests [was] required." *Bostick,* 501 U.S. at 435, 111 S.Ct. at 2386. When Mr. Solis finally opened the door to his motel room in his underwear, he was submitting to the deputies' show of authority.[8] We hold that the totality of the circumstances surrounding this encounter— the late hour of the episode, the three minutes of knocking on the door, the commands and requests to open the door, the one-and-a-half to two minutes of knocking on the outside window, and the shining of the flashlight through the small opening in the window's drapes onto the face of Mr. Jerez as he lay in bed—makes clear that a seizure took place. The record simply will not support the con-

---

**8.** For a seizure to occur, a person must submit to a "show of authority." *Kernats v. O'Sullivan,* 35 F.3d 1171, 1178 (7th Cir.1994); *Black,* 675 F.2d at 134–35; *see California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991) (A "show of authority" exists when "the officer's words and actions would have ... convey[ed] the message [to a reasonable person] that he was not free to disregard the police and go about his business."). This legal principle explains why a seizure does not occur if a person does not comply with an officer's command to "stop." *Hodari D.,* 499 U.S. at 629, 111 S.Ct. at 1552. In this case, Mr. Solis complied with the officers' demand to open the door, thereby submitting to a "show of authority." *See Brower v. County of Inyo,* 489 U.S. 593, 597–98, 109 S.Ct. 1378, 1381–82, 103 L.Ed.2d 628 (1989); *see also United States v. Kohler,* 836 F.2d 885, 888 (5th Cir.1988) ("[T]he stop occurred when the agent dressed in plain clothes knocked on the door and identified himself as a border patrol officer."); *United States v. Almand,* 565 F.2d 927, 929 (5th Cir.) (seizure occurred when Almand opened the door and stepped out in response to officer's knocking on door), *cert. denied,* 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978).

clusion that a reasonable person in the position of Mr. Jerez and Mr. Solis would have felt free to ignore the deputies and to continue about their business. A reasonable person in their situation could conclude only that the deputies would not leave unless the door was opened. Therefore, Mr. Solis and Mr. Jerez were seized within the meaning of the Fourth Amendment on the night of September 26, 1994.

## B. *Reasonable Suspicion*

 Because Deputies Hurrle's and Lent's actions, when considered in their totality, amount to an investigatory stop, the deputies must have had "a reasonable suspicion supported by articulable facts that criminal activity 'may [have] be[en] afoot.'" *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884). "Reasonable suspicion" is "more than an inchoate and unparticularized suspicion or hunch." *Id.* (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883) (internal quotations omitted). It is a concept that "is not 'readily, or even usefully, reduced to a neat set of legal rules.'" *Id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983)). In determining whether a reasonable suspicion existed, we must consider the "totality of the circumstances." *Id.* at 8, 109 S.Ct. at 1585; *United States v. Odum,* 72 F.3d 1279, 1284 (7th Cir.1995). In the end, the analytical process requires a practical determination; it "does not deal with hard certainties, but with probabilities." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). We must reach "a common sense conclusion" as to whether the articulable facts to which the deputies point reasonably would "raise a suspicion that the particular individual[s] being stopped [were] engaged in wrongdoing." *Id.*

 Although we defer to findings of historical fact and "give due weight to inferences drawn from those facts by resident

judges and local law enforcement officers," we review de novo whether the officers had reasonable suspicion to detain the appellants. *Ornelas v. United States,* —— U.S. ——, ——, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).[9] Deputies Hurrle and Lent articulated four facts that made them suspect Mr. Solis may have been involved in criminal activity: (1) He had a two-door vehicle, a "target" vehicle; (2) His vehicle had a license plate from Florida, a source state; (3) His vehicle was parked near an airport and an interstate; and (4) A criminal history check revealed that he had a suspended driver's license and an arrest or conviction for smuggling some type of contraband into a Florida jail. We begin by noting that each of these facts, standing alone, clearly would not be enough to give rise to a reasonable suspicion that Mr. Solis and his companion were involved in drug, or some other illicit, activity. The first three are true of innocent travelers. Similarly, Mr. Solis' prior record would not be enough by itself to justify the stop. *See United States v. Davis,* 94 F.3d 1465, 1469 (10th Cir.1996); *United States v. Santillanes,* 848 F.2d 1103, 1108 (10th Cir.1988). Moreover, the criminal history check did not reveal the type of contraband allegedly smuggled into the jail; for example, the contraband could have been money, food or cigarettes. *See* Fla. Stat. Ann. § 951.22 (West 1995). The deputies, based on a reasonable belief that Mr. Solis had a suspended license, could have stopped Mr. Solis had they observed him driving, *see Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979), but the belief that he had a suspended license and a prior smuggling incident would not justify a stop on the street or in his motel room.

Although several innocent facts may, when considered together, add up to reasonable suspicion, *Sokolow,* 490 U.S. at 9–10, 109 S.Ct. at 1586–87, the particular facts articulated in this case do not. Instead, we find the factors in this case to be analogous to those the Supreme Court considered in *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65

9. In its order, the district court did not find independently that the deputies had a reasonable suspicion, but it did adopt the recommendation of the magistrate judge. The magistrate judge

found that the deputies had "adequate justification," "albeit not necessarily rising to the level of reasonable suspicion." Magistrate Judge's Recommendation at 7.

L.Ed.2d 890 (1980). In *Reid*, a DEA agent stopped the defendant in the Atlanta Airport because the defendant's characteristics and actions fit the "drug courier profile": (1) The defendant arrived from Fort Lauderdale, a city the agent knew to be a principal source of cocaine; (2) He arrived early in the morning, when law enforcement activity is diminished; (3) He and his companion appeared to be concealing that the two were traveling together; and (4) He and his companion had no luggage except for their shoulder bags. *Id.* at 440–41, 100 S.Ct. at 2754. The Supreme Court concluded that "the agent could not, as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances." *Id.* at 441, 100 S.Ct. at 2754. The only fact that related to the individuals' conduct, the Court found, was that the defendant preceded his companion and occasionally looked backward at him. The Court found that the other circumstances describe a large number of "presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.* In this case, the facts known to the deputies were less suspicious than the ones found insufficient as a matter of law in *Reid.* Even in combination, the articulated characteristics could be ascribed generally to innocent travelers. *See United States v. Odum,* 72 F.3d 1279, 1285 (7th Cir.1995) (distinguishing from *Reid* an instance in which a number of facts were raised that could not be ascribed generally to innocent travelers); *United States v. McCarthur,* 6 F.3d 1270, 1278 & n. 3 (7th Cir.1993) (same); *Moya v. United States,* 761 F.2d 322, 325 (7th Cir.1984) ("We must be especially cautious when the evidence that is alleged to establish probable cause is entirely consistent with innocent behavior."); *United States v. Black,* 675 F.2d 129, 136–37 (7th Cir.1982) (holding that, although the totality

of circumstances supported a reasonable suspicion, it was not enough merely that the passenger had arrived from Fort Lauderdale, was the first off the plane, deplaned speedily and in a disoriented state, and appeared nervous), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). We have found justification lacking in cases similar to the one we are considering today. In *Packer,* we held that a citizen's complaint that a "suspicious" car, with four individuals and fogged windows, was parked on the street at 1 a.m. for more than an hour was not sufficient to justify a *Terry* stop. 15 F.3d at 658–59. In *Pavelski,* we found that a deputy failed to articulate facts indicating criminal activity when he described a car, bearing out-of-state license plates, that contained four men who refused to make eye contact with him and that made a sharp right-hand turn. 789 F.2d at 489. *Cf. Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) (noting that the "fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct"). The deputies simply cannot point to any facts which would give rise to a reasonable suspicion that Mr. Jerez and Mr. Solis "ha[d] committed or [were] about to commit a crime." *Royer,* 460 U.S. at 498, 103 S.Ct. at 1324 (plurality opinion).

### C. *The Consent to Search*

A consent to search following an illegal seizure is valid only if the evidence uncovered during the consent search has been come upon "by means sufficiently distinguishable to be purged of the primary taint." *Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975) (quoting *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)).[10] In obedience to the mandate of

---

**10.** The district court found that, under *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), Mr. Solis and Mr. Jerez voluntarily consented to the entry into their motel room and to the search of their luggage. However, the "inquiry does not end with a determination that [the] consent was voluntary, for if the agents had improperly 'seized' the defen-

dant[s], [their] consent to a search would have been tainted and the evidence should have been suppressed." *United States v. Morgan,* 725 F.2d 56, 58 (7th Cir.1984); see *Royer,* 460 U.S. at 507–08, 103 S.Ct. at 1329 (plurality opinion) ("Because ... Royer was being illegally detained when he consented to the search of his luggage, we agree that the consent was tainted by the

*Brown*, to determine whether the acquisition of evidence pursuant to consent is purged of the taint of an antecedent illegal seizure, we place a "heavy burden" on the government and look to "(1) the temporal proximity of the illegal detention [and the defendants' consent]; (2) the presence of intervening factors between the two events; and (3) the circumstances surrounding, and the nature of, the official misconduct." *United States v. Sanchez–Jaramillo*, 637 F.2d 1094, 1099 (7th Cir.) (citing *Brown v. Illinois*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62), *cert. denied*, 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79 (1980).

■ In this case, the consent to search followed almost immediately after the illegal seizure. Indeed, a short conversation was all that occurred between the two events, and that short conversation was part of the "res gestae" of obtaining the consent to search.[11] Moreover, no intervening event of any significance occurred between the illegal seizure and the consent to break the causal chain. The testimony of the officers establishes that

their conduct "had a quality of purposefulness." *Brown v. Illinois*, 422 U.S. at 605, 95 S.Ct. at 2262.[12] In concluding that the illegal seizure in this case vitiated the appellants' subsequent consent, we follow the strong body of case law in our circuit, as well as in other circuits, that has held, typically after applying *Brown v. Illinois*, that the voluntary consents at issue were tainted by illegal stops, detentions or arrests. *See United States v. Novak*, 870 F.2d 1345, 1353 (7th Cir.1989); *see also United States v. Valencia*, 913 F.2d 378, 382 (7th Cir.1990) ("If the agents illegally seized Valencia, the illegal seizure would have tainted his subsequent consent, since his consent presumably was the product of his detention.").[13]

## Conclusion

Because the seizure was not supported by reasonable suspicion and therefore vitiated the subsequent consent to search, we reverse the district court's judgment and hold that

illegality and was ineffective to justify the search."); *Notorianni*, 729 F.2d at 521–22 ("If ... there was an unconstitutional seizure of his person, the consent he gave was vitiated, and the fruits of the search should have been suppressed."); *United States v. Melendez–Garcia*, 28 F.3d 1046, 1054 (10th Cir.1994) ("[N]ot only must the government show that consent is voluntary in fact, but it must also demonstrate a break in the causal connection between the illegality and the consent, so that the court will be satisfied that the consent was 'sufficiently an act of free will to purge the primary taint.'") (quoting *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416–17); 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(d) (3d ed. 1996) ("[E]vidence obtained by the purported consent should be held admissible only if it is determined that the consent was both voluntary and not an exploitation of the prior illegality.... [T]he fruit of the poisonous tree doctrine also extends to invalidate consents which are voluntary.").

**11.** *See Taylor v. Alabama*, 457 U.S. 687, 691, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982) (taint not purged even though six hours passed between illegal arrest and confession); *Brown v. Illinois*, 422 U.S. at 604, 95 S.Ct. at 2262 (finding that two hours was temporally proximate).

**12.** Like the detectives in *Brown*, Deputies Hurrle and Lent "embarked upon this expedition for evidence in the hope that something might turn up[; t]he manner in which [the seizure] was effected gives the appearance of having been

calculated to cause surprise, fright, and confusion." 422 U.S. at 605, 95 S.Ct. at 2262. That the method employed was calculated to cause surprise, fright, and confusion was confirmed by Deputy Lent: "[O]ur reasons for sticking around were—and for proceeding to knock on the window were—[it] was beginning to be a late hour. [The p]eople [in the motel room were] from a strange city. [They m]ay in fact feel threatened if someone comes and knocks at the door, [at a] late hour. That's [also] why we proceeded to present ourselves as officers." Tr. at 93.

**13.** *See United States v. Babwah*, 972 F.2d 30, 34 (2d Cir.1992); *United States v. Ceballos*, 812 F.2d 42, 49–50 (2d Cir.1987); *United States v. McCraw*, 920 F.2d 224, 230 (4th Cir.1990); *United States v. Gooding*, 695 F.2d 78, 84 (4th Cir. 1982); *United States v. Chavez–Villarreal*, 3 F.3d 124, 127–28 (5th Cir.1993); *United States v. Cherry*, 759 F.2d 1196, 1211–12 (5th Cir.1985) (remand); *United States v. Grant*, 920 F.2d 376, 388 (6th Cir.1990); *United States v. Ramirez*, 91 F.3d 1297, 1302–04 (9th Cir.1996); *United States v. Suarez*, 902 F.2d 1466, 1468 (9th Cir.1990); *United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1299–1300 (9th Cir.1988); *United States v. Howard*, 828 F.2d 552, 556 (9th Cir.1987); *United States v. Melendez–Garcia*, 28 F.3d 1046, 1053–56 (10th Cir.1994) (remand); *United States v. Guillen–Cazares*, 989 F.2d 380, 382, 384 (10th Cir.1993); *United States v. Valdez*, 931 F.2d 1448, 1452 (11th Cir.1991); *United States v. Timberlake*, 896 F.2d 592, 595, 596 n. 2 (D.C.Cir. 1990).

the evidence found in the motel room must be suppressed. The case is remanded for further proceedings.

REVERSED AND REMANDED.

COFFEY, Circuit Judge, dissenting.

The defendants, Carlos M. Solis and Lenin M. Jerez, were arrested on September 26, 1994 by officers of the Milwaukee County Sheriff's Department after a search of their motel room revealed approximately three kilograms of cocaine. A federal grand jury subsequently indicted Solis and Jerez, charging each of them with possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). The defendants filed motions to suppress the evidence obtained during the search, arguing that the officers violated their Fourth Amendment rights because they had neither a warrant nor consent to search the room and lacked a reasonable suspicion of criminal activity. Magistrate Judge Aaron E. Goodstein conducted an evidentiary hearing and Detectives Donald Hurrle and Daniel Lent of the Milwaukee County, Wisconsin Sheriff's Department testified. After considering the testimony, the briefs, and the arguments, the magistrate judge recommended to the trial court that the defendants' motions be denied. On November 23, after reviewing the defendants' written objections to the magistrate's findings, the district court accepted and approved the magistrate judge's recommendation and denied the suppression motions. Thereafter, on December 5, Solis and Jerez entered pleas of guilty before the trial court, pursuant to plea agreements, while each of them reserved their right to appeal the court's denial of the motions. The pleas were accepted and following a hearing on February 17, 1995, the court sentenced each of the defendants to 57 months imprisonment, to be followed by five years of supervised release, for possessing cocaine with intent to distribute, and ordered each of them to pay a fine of $500 and a special assessment of $50.[1] Solis and Jerez appeal the district court's suppression ruling, arguing that the actions of Officers Hurrle and Lent subjected them to an unlawful *seizure* and that the *search* of their motel room was in violation of the Fourth Amendment.

## I. BACKGROUND

On September 26, 1994 around 7:25 PM, Detectives Donald Hurrle and Daniel Lent of the Milwaukee County Sheriff's Department were patrolling the area near Mitchell Field International Airport in Milwaukee County, Wisconsin, looking for individuals who might be involved in the drug trade. Both officers were assigned to the Department's drug interdiction unit, working to prevent the entry of illegal narcotics into Milwaukee County. Detectives Hurrle and Lent were experienced law enforcement officers: Detective Hurrle had served in the Sheriff's Department for twenty-six years, while his colleague Detective Lent had been with the Department for seven years.[2] On the evening of September 26, these officers were engaged in the type of drug surveillance activity routinely conducted by law enforcement officials in and around major transportation hubs (airports, train and bus stations). The officers were keeping an eye out for "target vehicles"[3] from "source states" such as Florida,

---

1. The defendants were sentenced at the low end of the applicable Guidelines range (57–71 months).

2. We know, from an earlier case involving Detective Hurrle, that as of December 1992 Hurrle had been assigned to the drug interdiction unit for approximately six years. *See Ornelas v. United States*, — U.S. —, —, 116 S.Ct. 1657, 1659, 134 L.Ed.2d 911 (1996) (discussed below). Thus, by the autumn of 1994, Hurrle had spent roughly eight of his twenty six years as a law enforcement officer specifically assigned to the task of investigating drug-related crimes in Milwaukee County. In *Ornelas*, the Supreme Court emphasized that a police officer "views the facts through the lens of his police experience and expertise." *Id.* at —, 116 S.Ct. at 1663. Hurrle is the same experienced law enforcement officer whose "inferences" regarding the facts, according to our nation's highest Court in *Ornelas*, were (and are) entitled to "due weight" from a reviewing court. *Id.*

3. "Target vehicles," Officer Hurrle testified, are usually vans or two-door vehicles. Such vehicles are favored by drug couriers because, as Hurrle explained, one can "hide a lot of controlled substance in the quarter panels." It is also common knowledge that drug couriers frequently drive vehicles with tinted windows such as those the officers observed on the defendants' vehicle.

Texas, Arizona, or California (i.e., states known to be the locus of intense narcotics trafficking).

Detectives Hurrle and Lent observed a white, two-door 1988 Honda Prelude with Dade County, Florida license plates and tinted windows in the parking lot of the Quality Inn located near Milwaukee County's Mitchell International Airport. Detective Hurrle testified that past experience in the field of drug interdiction, as well as prior experience and arrests in the same geographic area close to the airport, led him to conclude that a "target vehicle" (in this case, a two-door model with tinted windows), originating from a source county and state (Dade County, Florida), parked near the airport and the interstate, was likely to be involved in drug trafficking activity.

Hurrle, *via* his car radio, contacted the Communications Bureau of the Sheriff's Department and requested a check to ascertain the owner of the car and determine whether the vehicle was listed as stolen. The report revealed that the car was registered to a Carlos Solis, of Miami, Florida, and the car was not listed as being stolen. Hurrle next visited with the motel clerk to ascertain whether Solis was registered, and learned that a man named Carlos Solis was staying in Room 161.

Hurrle and Lent then went "across the street" to the airport (Sheriff's Department satellite office), in hopes of obtaining more information about Solis, including his criminal history, and to ascertain if he was wanted in any other jurisdiction. This investigation revealed that Solis' Florida driver's license was suspended *and* that he had recently been arrested (one month before, August of

1994) for smuggling contraband into the Dade County Jail.[4]

At about 8:25 or 8:30 PM, after attending to other matters unrelated to the investigation, the detectives returned to the motel to question Solis and found that his Honda was no longer in the parking lot. Detective Hurrle testified that they intended to knock on the door of Room 161 and were hoping to "get a consent search," i.e., voluntary, freely-given permission to search the room from its inhabitant(s). Hurrle and Lent maintained a surveillance of the area until approximately 10:45 PM, and departed without seeing the white Honda reappear in the motel parking lot. It was now close to the officers' "quitting time" (11:00 PM), so they returned to their airport office to transmit their daily reports to their central office.

Following his usual route home, just a few minutes past 11:00 PM, Detective Lent passed the motel and noticed that Solis' white Honda, previously observed, had reappeared in the parking lot. Lent radioed his partner and requested that he return to the parking area. Detective Lent set up surveillance of the parking lot while he waited for his squad partner. According to Lent, Detective Hurrle arrived five minutes later, and around ten minutes past 11:00 PM,[5] the detectives proceeded to Room 161 *via* the interior hallway of the building.[6] As Detective Lent explained at the evidentiary hearing:

> In discussion between myself and my partner, we believed that we had reasonable suspicion that based on the [fact that the] vehicle was from a source state, from a source city, which would be Dade County, Miami, Florida; based on the fact that the

---

4. The record is unclear as to whether Solis' criminal background check revealed an arrest or a conviction for smuggling contraband into the Dade County Jail. Deputy Sheriff Lent testified that the background check revealed a conviction, while Detective Hurrle testified that it showed an arrest. Defense counsel, looking for any possible means of casting doubt on the seriousness of Solis' criminal record, argues that Solis did not have a conviction but rather "an arrest which was not processed" (the meaning of an un-processed arrest is not clear). *In Florida, smuggling contraband into a county detention facility is a third-degree felony, punishable by as much as five*

*years in prison and a maximum fine of $5,000.* Fla.Stat.Ann. § 951.22 (West 1995).

5. When asked at the evidentiary hearing whether it would be a fair statement to say that the knocking occurred between 11:00 and 11:15 PM, Hurrle replied "Closer to 11:05." On the other hand, Lent testified that the time was approximately 11:10 PM.

6. The motel rooms in question are constructed with only one entrance to each room from a door that opens onto the interior hallway.

subject [Solis] ... had a prior criminal history, we decided at that point that we would proceed and have a verbal conversation with him and move forward from that point on.

Both Deputy Sheriffs testified that they took turns knocking "intermittently" or "on and off" on the defendants' door, for a period totalling about three minutes. "We didn't continuously pound on the door," Hurrle testified, "we just knocked normally." During this period, Lent, according to Hurrle's testimony, stated aloud " '[We are] [p]olice, we'd like to talk to you for a minute,' or words to that effect." Receiving no response, and thus growing somewhat more suspicious, Hurrle then walked outside to the exterior window, while Lent remained in the hallway. Hurrle testified during a thorough cross-examination that he proceeded to the exterior window for two reasons: (1) "[t]o find out if maybe the windows had [been] opened and somebody had fled" (with the drugs), and (2) to "get [the occupants'] attention by knocking on the window," as he was uncertain whether they had heard the knock on the door. Hurrle stated under oath that the exit door "was very close to 161," i.e., only about three doors down, such that there was only a brief time interval between the initial knocking on the interior doorway and Hurrle's appearance at the exterior window. Hurrle further stated that he knocked on the closed exterior window "[j]ust a couple of times." Then, with the aid of his flashlight, he looked into the room. The drapes were slightly open, and Hurrle could see an individual (subsequently identified as Jerez) moving around in the bed, located closest to the window. A short while after Hurrle's knock, Solis appeared and opened the drapes. The majority cites Detective Lent's testimony on cross-examination for the proposition that Hurrle "knock[ed] on the window *for* approximately one-and-a-half to two minutes" before Solis appeared. Although the majority infers that Hurrle knocked for the entire one-and-a-half to two minutes, such an inference is contradicted by the testimony of Hurrle (who did

the knocking). On direct examination, Hurrle was asked, "Approximately how long was it *between* the time that you knocked on the window, and the time that the person came to the window?" Hurrle responded, "Between a minute, a minute-and-a-half, maybe." Thus, Hurrle's testimony establishes—not that he knocked *for* a period of a minute and a half or even two minutes—but that there was an *interval* of a minute or, at most, a minute and a half, *between* the time that he knocked and Solis' appearance at the window. Detective Hurrle, clothed in a jacket with the emblem of the Sheriff's Department displayed on the front, in full view, announced that he was from the Sheriff's Department and said "We'd like to talk to you, Could you please open the door for us?" [7] Solis assented and nodded "yes."

Hurrle returned to the inner hallway, and observed Solis in the process of opening the door, clothed in his underwear. The interior of the room behind him was dark. Standing at the doorway, the officers again identified themselves, displayed their badges, and asked if they could "come in and speak with [them] for a minute." Hurrle testified that Solis "gestured with his hand *and* stated, [in English] 'Sure, come on in.' " Hurrle testified that Solis spoke English fluently and appeared to have no difficulty whatsoever understanding or communicating with either of the detectives. Similarly, Lent testified that Solis used the words " 'come in,' or words to that effect," and that Solis "*welcomed* [the detectives] in." (emphasis added). During cross-examination, Lent testified without either contradiction or challenge that Solis exhibited "*no hesitation*" about admitting him or his partner into the room. (emphasis added).

Upon entering the motel room and after Solis turned on the lights, the officers observed a half-smoked marijuana cigarette lying on top of the television in plain view. Asked what it was, Solis replied "That's all we've got." Hurrle then asked Lenin Jerez,

---

**7.** Officer Lent testified that from his vantage point in the hallway, he could hear Detective Hurrle identify himself again, knock, and ask

Solis to open the door so he could speak with him.

who was in bed, if he would get up and speak with them (a safety precaution, in that many drug dealers are armed and Jerez could well have been concealing a firearm underneath a blanket or pillow). According to Hurrle, Jerez "readily complied." Detective Hurrle testified that he and his partner then asked the defendants where they were from and why they were in Milwaukee. Both defendants replied that they were from Miami, Florida. Solis, according to Hurrle, claimed that he and Jerez were "on vacation" in Milwaukee. According to Detective Lent, Solis stated that they had come to Milwaukee to visit "relatives" in the area. However, testimony from both detectives reveals that neither of the defendants upon questioning identified any relatives (or other persons) in Milwaukee whom they were intending to visit, much less did they volunteer any other information, such as the addresses of these individuals.

Following this exchange, Detective Hurrle asked the defendants "if [they] had anything illegal in the room, such as a gun," and the defendants said "No." When Hurrle asked a second time if the defendants had anything illegal in the room, they replied "[N]o, we have nothing we shouldn't have, or words to that effect." The presence of the marijuana cigarette, in plain view, (to say nothing of the less than creditable statements regarding their visiting supposed unidentified relatives in Milwaukee and all of the other information then available to the officers concerning Solis) obviously cast doubt on the defendants' veracity. At this time, the officers asked Solis and Jerez if they could look through the room and the defendants' belongings. According to Lent's testimony, both defendants replied "go ahead." Similarly, Hurrle testified that "[t]hey both gestured, 'go ahead,' ... [a]lmost simultaneously." The officers' testimony regarding the consensual nature of the entry and the subsequent search of the room stands as a verity, for it is neither challenged nor contradicted anywhere in the record. At this juncture, the officers had neither drawn their weapons, nor blocked the doorway to impede the defendants' exit,

much less did they issue any verbal commands ordering Solis and Jerez not to depart from the room. While the officers did not inform the defendants that they could refuse a search of the room and/or their belongings, controlling precedent from the United States Supreme Court is very clear that the failure to advise them of this information does not render their consent to search involuntary. See, e.g., Ohio v. Robinette, —— U.S. ——, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (discussed below). After both defendants had given their voluntary consent to the officers to search, Detective Lent asked Solis and Jerez to step away from the beds and move towards the bathroom door, in order that he could watch them while Detective Hurrle searched the luggage near the beds. Hurrle found a small package bound with green plastic tape, in Jerez' bag, containing "a white, chunky, powdery substance" that looked and smelled and felt like it contained approximately one kilogram of cocaine.[8] Upon discovering the cocaine, Hurrle and Lent drew their weapons (hitherto concealed beneath jackets) and told the defendants to lie prostrate on the floor and arrested the defendants for possession of a controlled substance with intent to deliver, handcuffed them, and advised them of their constitutional rights. Shortly thereafter, Hurrle discovered an additional kilogram-sized package in Jerez' bag and a third such package of cocaine in a separate gym bag belonging to Solis (a total of approximately three kilograms of cocaine).

The defendants then, according to Hurrle, "stated that all the cocaine belonged to them and ... that they had brought it up from Miami to Milwaukee." (Initially, Jerez had denied that any of the cocaine belonged to him). The defendants also told the officers that the seized cocaine was to have been picked up by unnamed individuals in Milwaukee, and that they were to return to Miami and each of them was to receive payments of $2,000 (individually) for the delivery. The defendants did not volunteer any information about their drug operation, nor did they

---

**8.** After arresting the defendants, the officers

field-tested the substance in the three packages,

identify their Florida cocaine source [9] or their Milwaukee contact.

## II. ISSUES

Ignoring the Supreme Court's recent admonition that reviewing courts in Fourth Amendment cases should give deference to the conclusions of experienced law enforcement officers and resident judges, *Ornelas v. United States*, —— U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the majority begins its analysis by making a factual finding contrary to the trial court that the visit by Officers Hurrle and Lent to the defendants' motel room was a *seizure* for Fourth Amendment purposes. Building upon this foundation of quicksand, the majority concludes that the alleged "seizure" of the defendants was unlawful because the officers lacked a 'reasonable suspicion' of illegal activity before initiating contact with Solis and Jerez. According to the majority's strained interpretation of the Fourth Amendment, the officers were forbidden from even approaching the defendants to talk with them. The majority further reasons that the defendants' consent to *search* the motel room was invalid (i.e., neither voluntary nor consensual) because it "followed almost immediately after" actions on the part of the officers which the majority improperly characterizes as an "illegal seizure" (i.e., the officers' knocking on the door and requesting permission to speak with the defendants). According to the majority, the three kilograms of cocaine found in the motel room must be suppressed under the exclusionary rule because the consent to search was "tainted" by an allegedly "illegal seizure." I refuse to join with my colleagues as they once again engage in appellate factfinding and set forth *new and uncharted interpretations of Fourth Amendment law.* Unchallenged and uncontradicted testimony in the record establishes that the defendants' responses throughout their encounter with the experienced Detectives of the Sheriff's Department were voluntary and consensual, until the discovery of the three kilos of cocaine when they were placed under arrest. Thus, as the magistrate judge and the district court properly found as a matter of fact, *there was no "seizure" for Fourth Amendment purposes* and the defendants' consent to the search of their motel room was a valid "consent search." The majority has, in my view, failed to articulate compelling reasons for overturning the factual findings of the magistrate judge, even though the magistrate's findings were adopted by the experienced trial judge after thorough review and are entitled to considerable deference if we are to be consistent in our application of the clear error standard of review.

## III. DISCUSSION

The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. I am well aware that the occupants of a hotel or motel room have legitimate expectations of privacy that are protected by the Fourth Amendment. *United States v. Rosario*, 962 F.2d 733, 736 (7th Cir.1992); *Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964). However, when articulable facts lead experienced law enforcement officers to reasonably suspect the likelihood of criminal activity by certain persons in a certain location, those expectations of privacy decrease, and may, given the proper combination, be outweighed by society's interest in safety. This was such an occasion. *See, generally, Rakas v. Illinois*, 439 U.S. 128, 152, 99 S.Ct. 421, 435, 58 L.Ed.2d 387 (1978) ("The ultimate question ... is whether one's claim to privacy from government intrusion [under the Fourth Amendment] is reasonable in light of all the surrounding circumstances.").

A. *The Initial Encounter Between the Sheriff's Deputies and the Defendants As An Allegedly Unjustified "Seizure" Under the Fourth Amendment*

1. *The Officers' Knocking On the Door Did Not Amount to a Seizure*

The record in this case shows that two officers knocked on a motel room door at

---

and it tested positive for cocaine.

**9.** Later, Jerez named as the drug source a mysterious individual nick-named "Tiger," claiming

that the real identity and full name of this individual were unknown to them.

about 11:00 PM and were given permission by the defendants to enter and to search the room. The majority raises this rather straightforward encounter to the level of a constitutional violation, finding that the detectives' knocking on the motel room door during the nighttime hours was a "seizure" for Fourth Amendment purposes, and asserting that the detectives were required to have a "reasonable suspicion" of criminal activity before even initiating contact with the defendants. In fact, the record establishes that Detectives Hurrle and Lent did not "seize" the defendants, but merely approached them for voluntary questioning. Our case law is very clear that an entry of this type, being both consensual and voluntary, does not amount to a "seizure" and thus does not implicate the Fourth Amendment. As this court has observed on numerous occasions, "[i]t is ... well settled that *not all encounters between law enforcement agents and private citizens implicate the Fourth Amendment's ban on unreasonable searches and seizures." United States v. Odum,* 72 F.3d 1279, 1283 (7th Cir.1995). Such encounters between law enforcement officers and citizens fall into one of three categories:

> The first category is an arrest, for which the Fourth Amendment requires that police have *probable cause* to believe a person has committed or is committing a crime. The second category is an investigatory stop [or *"Terry* stop"], which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a *reasonable suspicion* that a person has committed or is committing a crime. *The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.*

*Id.* (emphasis added, quotation omitted). With regard to the third category (voluntary encounters), we have held that " 'the degree

of suspicion required is *zero.'* " *United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied,* 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991) (quotation omitted).

The appellants invite this court to cast aside the factual finding of the experienced magistrate judge and trial judge that the encounter with Officers Hurrle and Lent on September 26, 1994 was consensual and thus not a "seizure." They assert that the officers' conduct in this case was so "outrageous" that it constituted a *Terry* stop, i.e., a brief investigatory stop which must be justified by "reasonable suspicion" that criminal activity is afoot. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). My colleagues in the majority have accepted the appellants' invitation to engage in the creation of new factual findings and conclude that the encounter was a "seizure," permissible only if supported by "reasonable suspicion." The majority reasons that the officers, knocking at the motel-room door at night, and knocking more than once, somehow placed the defendants in an inherently intimidating and coercive atmosphere, and that despite being protected behind a locked door, with a telephone at their side to call for help or assistance, the defendants were somehow *compelled* to open the door and cooperate with the officers. Thus, in the view of the majority, Solis and Jerez were "seized" or detained.[10] My colleagues, furthermore, accept the appellants' claim that the evidence and statements obtained as a result of the alleged "seizure" must be suppressed because the officers lacked sufficient information to form a "reasonable suspicion" that criminal activity was afoot before initiating contact with the defendants. By embracing the appellants' arguments and ignoring the officers' unchallenged testimony, the majority creates out of whole cloth a new and hitherto unrecognized and unknown exception to the well-recognized rule that voluntary encounters between citizens and law enforcement officers are not "seizures" and do not violate the Fourth Amendment.

---

10. The appellants also make this argument in conjunction with their assertion, discussed below, that they were coerced into consenting to

the search of the motel room and their belongings.

The experienced resident judges (magistrate and trial) properly rejected the appellants' seizure or *"Terry* stop" argument in denying the defendants' motions to suppress. As the Government urged, the court found that the initial encounter between the defendants and the Deputy Sheriffs was *voluntary* and *consensual* in nature, and therefore *did not constitute a seizure for Fourth Amendment purposes.* The determination as to whether an encounter with law enforcement officials is voluntary, and therefore not a seizure, is *highly factual* and *depends on the circumstances of the particular case. United States v. Maldonado,* 38 F.3d 936, 939 (7th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 205, 133 L.Ed.2d 138 (1995) (citations omitted). Accordingly, appellate review of such determinations is limited, and this court will overturn the decision of the district court only for *clear error. Id.*

The Supreme Court's recent decision in *Ornelas,* —— U.S. ——, 116 S.Ct. 1657, an appeal from a decision of this court, *did not cast aside the deferential standard of review* which applies to a district court's determination as to whether a seizure or "investigatory stop" has taken place. In *Ornelas,* the Government conceded that the disputed police-citizen encounter constituted an "investigatory stop," permissible only if supported by reasonable suspicion, and that the officers' partial dismantling of the defendants' automobile (which yielded cocaine) was a "search" which required the existence of probable cause. A panel of this court, applying the "clear error" standard of review, had affirmed the district court's conclusions in *Ornelas* that (1) reasonable suspicion existed to stop and question the defendants, and (2) probable cause existed to partially dismantle the automobile's interior. *United States v. Ornelas–Ledesma,* 16 F.3d 714, 719 (7th Cir. 1994). The Supreme Court reversed and remanded on the standard of review question, holding that "as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo." Ornelas,* —— U.S. at ——, 116 S.Ct. at 1663 (reaffirming the law of this circuit prior to 1994, as set forth in *United States v. Randall,* 947 F.2d 1314, 1317 (7th Cir.1991)). Thus, while the High Court did enunciate a

*de novo* standard for scrutinizing lower-court determinations as to the existence of reasonable suspicion and/or probable cause, it did *not* apply this standard to a district court's finding that a search or seizure actually had taken place. Moreover, as discussed *infra, Ornelas* mandated that in Fourth Amendment cases *reviewing courts must defer to the conclusions of experienced law enforcement officers and resident judges.* Specifically, *Ornelas* held that findings of historical fact are to be reviewed for clear error. —— U.S. at ——, 116 S.Ct. at 1663. As this court has previously held, "[a] finding is clearly erroneous when, after comprehensive review of the evidence, this court is left with 'the definite and firm conviction that a mistake has been made.' " *United States v. Duguay,* 93 F.3d 346, 349 (7th Cir.1996) (quotation omitted).

I have been unable to find any error on the part of the resident judges who considered and rejected the defendants' suppression motions, and I refuse to accept the majority's insistence (contrary to the trial court's finding and unsupported in the record) that a "seizure" rather than a voluntary encounter occurred when the officers approached Solis and Jerez on the evening of September 26, 1994. There is no definitive rule of law for determining when a "seizure" has taken place. However, as the author of today's majority opinion recognized in an earlier case, when quoting the Supreme Court's decision in *Bostick,* there are clear limitations on what should and should not be considered a "seizure":

> Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. *Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen, may we conclude that a 'seizure' has occurred.*

*United States v. Wilson,* 2 F.3d 226, 229 (7th Cir.1993) (quoting *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991)). Until now, this court has not strayed beyond the parameters outlined in *Bostick, supra.* We have held, for example, that police hand-cuffing of an individual for a brief duration amounts to a

limited type of seizure. *Wilson*, 2 F.3d at 231. And we have concluded that a drug courier suspect was effectively "seized" when officers pulled him over for speeding, inspected the documentation for his vehicle, and then told him that a canine unit was being called to the scene. *United States v. Finke*, 85 F.3d 1275, 1281 (7th Cir.1996) (a reasonable person, after being told about the canine unit, would not have felt free to disregard the police and go on his way). However, common sense and controlling case law, including *Bostick*, obviously place limits on how far this court may go in finding that a "seizure" has taken place. Specifically, we must be mindful of the Supreme Court's holding that "[a] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Bostick*, 501 U.S. at 434, 111 S.Ct. at 2386 (quotation omitted) (police officers did not "seize" defendant when they approached him on a bus and asked to search his luggage). A person is not "seized" when his or her encounter with police is consensual and voluntary in nature, and an encounter is properly deemed *consensual* or *voluntary* when it involves *"no restraint on the citizen's liberty, and . . . is characterized by an officer seeking* the citizen's *voluntary cooperation through non-coercive questioning." Maldonado*, 38 F.3d at 939; *see also Wilson*, 2 F.3d at 229.

Not surprisingly, in light of the Supreme Court precedents I have previously pointed out, the majority is unable to cite us to any case law in support of its holding that when law enforcement officers knock on an individual's door at night, properly identifying themselves and requesting an opportunity to ask a few questions, they create what the majority classifies as an atmosphere *so intimidating and coercive that the individual is "seized" for purposes of the Fourth Amendment.* As discussed in the second part of this opinion, the factors associated with "intimidating" police conduct (such as threats, displays of weapons, large numbers of officers, et cetera) were not present in this case. The two isolated factors relied upon by the majority (the officers' knocking on the door more than once and the alleged lateness of the hour) are certainly insufficient to justify the setting aside of the district court's

well-reasoned assessment of the *totality of the circumstances* and its conclusion that what transpired in this case was a voluntary encounter and not a "seizure." Solis and Jerez, unlike persons who are approached by law enforcement officers on a bus or a train, *Bostick*, 501 U.S. 429, 111 S.Ct. 2382, were secure behind their locked motel room door. After seeing and hearing the officers, the defendants could, from their vantage point, decide to voluntarily cooperate with the officers, as they did, or they could ignore the officers or alternatively tell them to go away, or they could even ask the motel management for assistance in dealing with unwanted visitors. The majority relies upon the Supreme Court's holding, in *Michigan v. Chesternut*, that a seizure occurs if a reasonable person, in similar circumstances, would not have felt "free to leave." 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). "As a practical matter," the majority asserts, the defendants "could not have expressed their desire to terminate the encounter with police by leaving the scene." Maj. op. at 689. I ask: "Why couldn't they?" It is evident that by engaging in reverse appellate fact-findings of this kind, the majority is disregarding the relevant case law and improperly substituting its own assessment of the facts for the district court's balanced and objective consideration of the totality of the circumstances. Moreover, as the Supreme Court has clarified since *Chesternut, the freedom to physically leave the scene of the encounter with law enforcement officers is not a necessary precondition to giving voluntary consent, as the majority incorrectly suggests.* Indeed, "so long as a reasonable person would feel free 'to *disregard* the police and go about his business,' the encounter is consensual and *no reasonable suspicion is required." Bostick*, 501 U.S. at 433, 111 S.Ct. at 2386; *see also Maldonado*, 38 F.3d at 939; *United States v. Robinson*, 30 F.3d 774, 782 (7th Cir.1994); *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. As Justice Rehnquist explained in *INS v. Delgado* more than ten years ago, a person may voluntarily consent to questioning by law enforcement officers (just as he may voluntarily consent to a search of his home) *even if he is unaware of*

his right to "disregard the police and go about his business":

> While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded [e.g., due to the presence of many officers, coercive statements, and/or drawn weapons], one cannot say that the questioning resulted in a detention under the Fourth Amendment.

466 U.S. 210, 215, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984); see also Schneckloth v. Bustamonte, 412 U.S. 218, 234, 93 S.Ct. 2041, 2051, 36 L.Ed.2d 854 (1973) ("[K]nowledge of a right to refuse is not a pre-requisite of a voluntary consent."). During its most recent term, the Supreme Court reaffirmed cases such as Delgado and Schneckloth by holding that an individual approached for questioning by a law enforcement officer need not be informed that he is "free to leave" (or free to disregard the officer) in order for the encounter to be deemed consensual. Robinette, —— U.S. ——, 117 S.Ct. 417.

The majority also gives the erroneous impression that consent searches may only take place in one of two contexts: (1) in a "public place" such as "an airport, train terminal or on the street," or (2) "in a confined space such as a bus." Maj. op. at 689–90. This is not the law. Just as an officer of the law may approach an individual on the street for voluntary questioning, he may also knock on an individual's door to request to speak with him or her. See, e.g., United States v. Dickerson, 975 F.2d 1245 (7th Cir.1992), cert. denied, 507 U.S. 932, 113 S.Ct. 1316, 122 L.Ed.2d 703 (1993). It is both commonplace and proper for law enforcement officials to initiate such encounters as they seek to investigate suspected criminal activity. Moreover, although the officers were not required

to have "reasonable suspicion" of criminal activity before knocking on the defendants' door to engage them in voluntary questioning, it is clear that Detectives Hurrle and Lent were acting on more than a "gut feeling" or a "hunch" when they approached the defendants. See United States v. Sokolow, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585–86, 104 L.Ed.2d 1 (1989). Indeed, as discussed below, the facts and circumstances known to the officers before they decided to knock on the door rose to the level of "reasonable suspicion." Solis and Jerez, like the person approached by officers of the law on the street, could have refused to speak with the officers or ignored them altogether; or, they could have refused to either open the locked door or answer the officers' questions. In fact, a person who is ensconced in his home (or his motel room), behind a locked door, does not confront the law "face to face" and thus finds himself in a situation far less coercive or intimidating than that of the person meeting an officer eyeball-to-eyeball on a public thoroughfare. Voluntary encounters between law enforcement officers and the citizenry are permitted under the Fourth Amendment to our Constitution, whether they occur on the street, in a bus (see Bostick, supra), or on a citizen's front doorstep, and under the Fourth Amendment officers of the law are not required to have any special justification (i.e., "reasonable suspicion") before initiating such encounters as part of their good-faith effort to investigate and eradicate crime. As the Ninth Circuit once observed, in a case cited by the majority, constitutionally speaking anyone may "knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law." United States v. Roberts, 747 F.2d 537, 543 (9th Cir.1984) (citing Davis v. United States, 327 F.2d 301, 303 (9th Cir.1964)).[11] Furthermore, I am aware of no constitutional rule which permits such encounters to occur during daytime hours only. See, e.g., Wis-

---

11. Davis, admittedly, involved law enforcement officers who knocked on the defendant's door "at high noon." 327 F.2d at 303. However, for reasons set forth in the second part of this opinion, I do not believe that the timing of the officers' visit to the defendants' motel room (at approximately 11:10 PM) precludes a finding that the encounter and the search were voluntary and consensual.

*consin Action Coalition v. City of Kenosha,* 767 F.2d 1248 (7th Cir.1985) (recognizing right to engage in door-to-door canvassing during the evening hours, in this instance between 8 PM and 9 PM at night); *City of Watseka v. Illinois Public Action Council,* 796 F.2d 1547 (7th Cir.1986) (striking down ordinance which allowed door-to-door canvassing only during the daytime).

A knock at the door only ripens into a seizure when law enforcement officers "use their *authority* ... to *command* the occupants to open the door." *United States v. Winsor,* 846 F.2d 1569, 1573 (9th Cir.1988) (emphasis added). " '[T]he law is well established that *if the officer asks rather than commands, the person accosted is not seized, and so the protections of the Fourth Amendment do not attach.' " United States v. Stribling,* 94 F.3d 321, 323 (7th Cir.1996) (quoting *United States v. DeBerry,* 76 F.3d 884, 885 (7th Cir.1996)) (emphasis added). The majority selectively cites parts of the record in an attempt to convey the impression that Officers Hurrle and Lent *"commanded"* the defendants to open the door and answer their questions. On direct examination, Detective Lent testified: "I believe at one point we knocked on the door, and I believe either myself or Detective Hurrle stated that we were the Police and *that we just wanted to talk to them.* And *requesting* them to open the door [for this purpose]." Lent's testimony on cross-examination (quoted by the majority) was that either he or Detective Hurrle stated "Police. Open up the door. We'd *like* to talk to you." These words, it is important to remember, were intoned in neither a loud nor an intimidating fashion, because the officers did not wish to intimidate the defendants or disturb the other occupants of the motel. Moreover, these words did not amount to a command. As the officers testified, it was their intention to "get a *consent* search," and they were well aware that a search of the room would be impossible without the voluntary cooperation of the occupants. The command phrase "Open up the door," in certain instances, may properly be interpreted as an order or command. But this was not the situation at the doorway to Room 161 shortly after 11:00 PM on September 26, 1994, for the officers stated, in mea-

sured voices, "We'd *like* to talk to you," which is in the nature of a polite request. On balance, therefore, I do not believe it is reasonable to conclude that Solis and Jerez were *commanded* to open the door and/or answer questions. The majority, with its characterization of the officers' words as "commands," has overstepped its proper role as an appellate court and substituted its own findings of fact for those of the local and experienced magistrate and trial judge, notwithstanding the Supreme Court's recent directive in *Ornelas* that "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." — U.S. at ——, 116 S.Ct. at 1663.

Police conduct may only be considered improper—and any consent derived therefrom tainted by coercion or compulsion—if a citizen is confronted with "the *threatening presence of several* [i.e., more than two] officers, the *display of a weapon* by an officer, some *physical touching* of the person of the citizen, or the use of *language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Packer,* 15 F.3d 654, 657 (7th Cir.1994) (quotation omitted). Also, in certain instances it may be considered improper for law enforcement officers to employ subterfuge to cause an individual to open the door and answer questions (e.g., by ringing the doorbell and claiming to be the postman or a deliveryman). However, this record is barren of any testimony that the officers resorted to any improper tactics of this nature, be they intimidating or deceptive. The record thus fails to support the majority's new factual finding that the encounter was involuntary and nonconsensual. The officers in this case knocked on the door in a normal fashion, identified themselves as officers, and asked, in a conversational tone, if they might enter and speak with the defendants. The officers did not take any actions, before or after being admitted into the room, that could reasonably be interpreted as coercive, such as withdrawing their weapons (the officers displayed their weapons only as they

were arresting the defendants, which happened *after* the discovery of the cocaine in their luggage).

Another form of coercion or intimidation that can sometimes render consent involuntary occurs when law enforcement officers improperly persist in their efforts to communicate with a defendant *after* the defendant has made it clear that he or she does not wish to continue the encounter. That was the scenario in *United States v. Wilson,* cited by the majority, wherein officers continued to ask if they could search an individual's coat, even after the individual flatly denied permission for a search. 953 F.2d 116 (4th Cir.1991). The court in *Wilson* held that what started out as a consensual encounter was transformed into a seizure because, in contrast with the instant case, the officers improperly persisted in attempting to obtain a consent search long after the defendant "conveyed an *unequivocal* unwillingness" to continue the encounter. Id. at 123. My colleagues, without legal support, argue that the defendants' decision not to answer the officers' knocking immediately must be interpreted as a "refusal to admit" the officers. This initial silence, they further contend, is somehow analogous to Wilson's "unequivocal" verbal statement denying officers permission to search his coat. Jerez and Solis may have been occupied discussing any number of matters, including where and how they might cleverly conceal the drugs and/or how to destroy the drugs. So also might they have been waiting for the room to clear of any marijuana aroma (i.e., the half-smoked marijuana cigarette discovered on top of the TV set). This brief silence cannot reasonably be interpreted as an "unequivocal" expression of unwillingness to admit the officers. If, instead of welcoming the officers into the room, the defendants had said "Go away," or "We don't want to talk to you" (as they could *easily* have done), and if the officers had persisted in attempting to gain entry for a lengthy period, then the facts of this case would be closer to those in *Wilson* and this court might want to take a closer look at the question of whether the officers' conduct was unreasonable. However, Solis and Jerez—far from communicating an unwillingness to admit the officers or speak with them—actually "welcomed" Hurrle and Lent into their room and voluntarily permitted the ensuing search.

At each crucial step, the record demonstrates that the encounter was characterized by the defendants' voluntary cooperation. Moreover, Solis was no neophyte in his dealings with the law, as demonstrated by his recent arrest and/or conviction for smuggling contraband into a jail in Dade County, Florida, an area where drug activity is prevalent; thus, he was less likely than the average law-abiding person to find the presence of law enforcement officers intimidating (this may explain why—despite the presence of large amounts of cocaine in his luggage—Solis did not appear at any time to be flustered or ill-at-ease in the presence of the officers).

Based on the totality of the facts and circumstances, it is obvious that the defendants were not "seized" for Fourth Amendment purposes when the officers knocked on the door and requested to speak with them, or when the defendants responded by voluntarily permitting the officers' entry into the room for this purpose.[12] I would affirm the experienced local trial judge's finding that the initial encounter between the officers and the defendants was voluntary and therefore *not* a "seizure" within the meaning of the Fourth Amendment. Thus, the officers *need not have had "reasonable suspicion,"* much less *"probable cause,"* before *knocking on the motel room door.* When an encounter is consensual, as it was here, our case law is clear that the Fourth Amendment simply does not apply. Thus, just as Officers Hurrle and Lent were not required to have "reasonable suspicion" before approaching the defendants, neither does the law require them to have "reasonable suspicion" before knocking on this writer's door—even at 11:00

---

12. As Detective Hurrle explained at the evidentiary hearing, the presence of the marijuana cigarette would have justified a temporary detention of the defendants for the purpose of issuing a County citation for possession of marijuana. Eventually, of course, the defendants were "seized" (i.e., arrested) following the consensual search of their belongings, which revealed the presence of cocaine.

PM—to ask permission to enter and ask a few questions.

2. *Although the Officers Were Not Required to have "Reasonable Suspicion" Before Approaching the Defendants for Voluntary Questioning, the Facts Known to Them Prior to Knocking on the Motel Room Door Did Give Rise to a "Reasonable Suspicion" of Criminal Activity.*

Even assuming, for the sake of argument, that the defendants were subjected to a *Terry* stop, I am of the opinion that "reasonable suspicion" justified the detectives' initial decision to approach the defendants and question them, inasmuch as the defendants (one of whom had a suspended driver's license and a recent arrest and/or conviction on his record) were driving a "target vehicle" from a "source state" in an area of Milwaukee County known by the experienced local officers to be used at times by drug dealers. The magistrate judge (whose report and recommendation the district court adopted) concluded that there was "adequate justification for the limited intrusion of knocking on the defendants' window and door." "This court review[s] *de novo* the district court's judgment on ... [the existence of] reasonable suspicion." *Randall*, 947 F.2d at 1317; *see also Ornelas*, —— U.S. ——, 116 S.Ct. 1657. However, because the inquiry as to whether law enforcement officers had reasonable suspicion "is necessarily fact-specific, we give *special deference* to the district court that heard the testimony and observed the witnesses at the suppression hearing." *Stribling*, 94 F.3d at 323 (citing *United States v. Navarro*, 90 F.3d 1245, 1251–52 (7th Cir. 1996)) (emphasis added). As the Supreme Court recently pointed out in *Ornelas*, "a *reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."* —— U.S. at ——, 116 S.Ct. at 1663. The *Ornelas* case, interestingly, also *arose out of an arrest in Milwaukee County* and *involved the same Officer Hurrle,* whose many years of law enforcement experience Justice Rehnquist referred to in his opinion. —— U.S. at ——, 116 S.Ct. at 1659.

The decision in *Ornelas,* furthermore, observed that:

> A trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise, *a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference.*

*Id.* (emphasis added).

In order to have "reasonable suspicion," a law enforcement officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585 (quotation omitted). He or she must be able to point to facts that rise to "'some *minimal* level of objective justification.'" *Id.* at 7, 109 S.Ct. at 1585 (quotation omitted). However, the level of suspicion required for a *Terry* stop is considerably less than the quantum of evidence required to justify a full arrest (probable cause). *Id.* As the United States Supreme Court has explained:

> In *Terry* this Court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating criminal behavior even though there is not probable cause to make an arrest.' *The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause ... to simply shrug his shoulders and allow a crime to occur or a criminal to escape.* On the contrary, *Terry* recognized that *it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.*

*Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (citations to *Terry* omitted) (emphasis added). This court recently had occasion to summarize the law concerning investigatory or *Terry* stops in *United States v. Duguay*:

*Terry* requires that in order to stop a person for investigative purposes, a law enforcement official must be 'able to point to specific and articulable facts' that give rise to a reasonable suspicion of criminal activity. *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1880. Under circuit precedent:

> [T]he reasonableness of an investigatory stop may be determined by examining: (1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion, and (2) whether the degree of intrusion was reasonably related to the known facts.

*United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir.1994). The inquiry on appeal must focus on 'the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion.' *Ornelas*, —— U.S. at ——, 116 S.Ct. at 1661.

93 F.3d at 350. As we also pointed out in *Duguay*, "[r]easonable suspicion is to be determined in light of the *totality* of the circumstances." *Id.* (the "cumulative effect" of several factors may arouse reasonable suspicion, even if the factors taken singly would not give rise to reasonable suspicion).

The Supreme Court has consistently emphasized that law enforcement officers are expected to apply their experience, knowledge, expertise, and training when called upon to make an on-the-scene assessment of the *probability* of criminal activity:

> [T]he essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. . . .
>
> *The process does not deal with hard certainties, but with probabilities.* Long before the law of probabilities was articulated as such, practical people formulated certain *common-sense conclusions about human behavior;* ... factfinders are permitted to do the same—*and so are law enforcement officers.* Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). "Reasonable suspicion" and "probable cause," as the High Court reminded us in *Illinois v. Gates*, 462 U.S. 213, 231–32, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983), are "fluid concept[s]—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Thus, as the author of today's majority opinion once observed, "[t]he determination of whether [reasonable suspicion] exists in a given situation involves the 'factual, practical considerations of everyday life upon which reasonable, prudent [persons], not legal technicians, act.'" *Bergren v. City of Milwaukee*, 811 F.2d 1139, 1142 (7th Cir.1987) (quotation omitted). In determining whether a law enforcement officer was justified in briefly detaining a possible drug smuggler for questioning, "we consider the 'totality of the circumstances' *as they were presented to the officer at the time of the encounter.* Included in this picture are the *officer's experience and his knowledge of the typical behavior of persons involved in drug smuggling.*" *United States v. McCarthur*, 6 F.3d 1270, 1277–78 (7th Cir.1993) (emphasis added); *see also Finke*, 85 F.3d at 1280 ("In forming his suspicions, [officer] was entitled to assess the defendants' behavior in light of his experience as a police officer and his knowledge of drug courier activity."); *United States v. Teslim*, 869 F.2d 316, 322 (7th Cir.1989) (reasonable suspicion may be based upon "the officers' knowledge and experience of the methods used in drug courier activity" as well as "characteristics of persons engaged in such practices.").

I find no reason to question, much less reverse, the district court's finding that the officers in this case had "adequate justification" (i.e., "reasonable suspicion") to seize or detain Solis and Jerez. When, based upon the facts in their possession, the officers proceeded to approach the defendants for questioning, they were not, as defense counsel suggested at the evidentiary hearing, acting on a mere "hunch." Rather, they were relying on the facts and circumstances before them, which they viewed in light of considerable knowledge, experience, training, and expertise, including specifically *"past experi-*

*ence and arrests in the area."* Detectives Hurrle and Lent, who had 26 and 7 years of law enforcement experience respectively (much of it in the field of drug interdiction), testified that they observed (1) a "target vehicle" (a small, two-door vehicle with tinted windows), (2) from a "source state" (Florida and specifically Dade County, where the drug trade is notoriously active), (3) in a part of Milwaukee County, Wisconsin where drug courier activity is common (close to both the airport and the interstate highway). The officers also learned that the vehicle was licensed to one Carlos Solis, whose driver's license privileges had been suspended *and* who, but one month earlier, had been arrested and/or convicted for smuggling contraband into the Dade County, Florida Jail. While "there may be an innocent explanation for each of these factors taken separately," *Finke,* 85 F.3d at 1280, we are obligated to "view[ ] the circumstances *in combination,*" *Id.,* as the officers in the field did, and must under *Ornelas* defer to the officers' reasonable inference that criminal activity was afoot. *See also Sokolow,* 490 U.S. at 9, 109 S.Ct. at 1586 (each factor standing alone insufficient, but "taken together they amount to reasonable suspicion"); *Teslim,* 869 F.2d at 322 (in analyzing reasonable suspicion, court must look to totality of circumstances). The detectives were not specifically asked at the evidentiary hearing whether Solis and Jerez matched a "drug courier profile." Nevertheless, it is clear from the officers' testimony that the defendants fit the well-accepted "drug courier profile" that is frequently the basis for further investigation by law enforcement officers, especially those experienced and trained in drug interdiction investigative procedures.

The factors described above, *supra,* at p. 708, when considered in combination, led the experienced officers to the reasonable conclusion that the operator of the two-door white Honda from Florida, parked near the interstate and the airport, could very well be involved in the unlawful distribution of narcotics. To use the terminology of the Supreme Court in *Ornelas,* the officers' *"experience and expertise"* [i.e., their special knowledge of the *"background facts"* concerning drug trafficking in this particular part of Milwaukee County] provided a "context" for the specific "historical facts" in the case [what they observed on the evening of September 26, 1994]. Together, the "background facts" and the "historical facts" yielded a reasonable inference that Solis and Jerez were actively involved in the drug trade. Such an inference, according to the Supreme Court in *Ornelas,* "deserve[s] deference" from a reviewing court. —— U.S. at ——, 116 S.Ct. at 1663.

The majority, citing *Ornelas* but disregarding its precepts, argues that the facts and circumstances known to Officers Hurrle and Lent prior to their knocking on the defendants' door "were less suspicious than the ones found insufficient as a matter of law" in *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) and in a handful of cases from this circuit. I disagree. In *Reid,* the law enforcement officer lacked knowledge that the person he stopped for questioning had any kind of criminal record. Detectives Hurrle and Lent, by contrast, observed a far richer and more complete "drug courier profile." Before they knocked on the motel room door, they were aware—not only that Solis was driving a target vehicle from a source county in a source state, and that he was parked in an area known for drug-trafficking—and furthermore, that Solis's driver's license had been suspended *and* that he had recently been arrested and/or convicted for smuggling contraband into a jail in Dade County, Florida (a drug source county in a drug source state). While the facts available to the officers when they stopped Reid would be characteristic of "a large number of presumably innocent travelers," *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754, the same cannot be said in this case.

This circuit's decision in *United States v. Pavelski,* 789 F.2d 485, 489 (7th Cir.1986), cited by the majority, is distinguishable. In *Pavelski,* we held that law enforcement officers in Portland, Oregon lacked reasonable suspicion when they stopped a vehicle on the basis that the vehicle (1) contained four men, (2) had out-of-town license plates (from Colorado, not a "source state"), and (3) made a sharp, abrupt turn. Beyond these facts, the

officer who made the investigatory stop in *Pavelski* possessed no further "objective facts indicating criminal activity." *Id.* He even admitted in his testimony that he acted on "a gut feeling that things were real wrong." The facts known to Officers Hurrle and Lent, by contrast, were objectively speaking far more suspicious, and there is no testimony from either officer that they were proceeding on "gut feelings" or intuitions, as was the case in *Pavelski.*

Similarly, in *Packer,* another case cited by the majority, we held that police lacked reasonable suspicion to justify an investigatory stop merely because they received a report of four men parked in a vehicle during the wee hours of the morning *in an area not known for drug activity.* 15 F.3d 654. Here, experienced law enforcement officers initially observed a suspected drug-courier vehicle in an area that they knew to be frequented by drug couriers (because of its proximity to the airport and the freeway).

To summarize, Hurrle and Lent approached Solis and Jerez to ask some questions because a *combination* of the facts and circumstances made them aware, as experienced officers in the field of drug interdiction, that illegal, drug-related activity might very well be afoot. Thus, even if a limited seizure or *Terry* stop occurred, I am of the opinion that it was justified by reasonable suspicion and that consequently the "fruits" of that stop should not be suppressed under the exclusionary rule.

### B. *Did the Defendants Voluntarily Consent to the Search of Their Motel Room?*

Having previously discussed and rejected the claim that an unlawful *seizure* of the defendants took place, let us analyze and apply the law to the facts to determine whether, as the appellants and my colleagues assert, the entry into and the ensuing *search* of the motel room violated the Fourth Amendment. Perhaps with good reason, the majority fails to thoroughly analyze the defendants' consent to search, and instead assumes that this consent was "tainted" or "vitiated" because it directly followed an (allegedly) unlawful seizure. Our case law is

clear that if the police conduct preceding a search "was not illegal, the question of taint becomes irrelevant." *United States v. Valencia,* 913 F.2d 378, 382 (7th Cir.1990). As discussed above, on review I see nothing illegal about the conduct of Detectives Hurrle and Lent. Therefore, I reject the majority's "taint" argument and proceed to analyze, in light of well-established precedent, a consent to search that was clearly and unmistakably voluntary, as determined by the experienced magistrate judge and trial judge.

One of the recognized exceptions to the Fourth Amendment's warrant requirement is a search conducted pursuant to consent given freely and voluntarily. *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990) (citing *Schneckloth,* 412 U.S. 218, 93 S.Ct. 2041). As a panel of this court explained recently, "[c]onsent lifts the warrant requirement of the fourth amendment but only if the consent to search is voluntary." *Stribling,* 94 F.3d at 324 (quotation omitted). "Consent searches" are by no means new to search and seizure jurisprudence. As this court has observed:

> Consent searches are a standard investigatory technique used by law enforcement agencies. Such searches normally occur on the roadside *or in a person's home or office,* often *under informal and unstructured conditions.* They are acceptable because *it is reasonable for law enforcement [officers] to conduct a search once they have been permitted to do so.*

*United States v. Dorsey,* 27 F.3d 285, 290 (7th Cir.1994).

I thus come to the central issue in this case: whether the defendants voluntarily consented to the search of their motel room. I conclude that they did.

#### 1. *Standard of Review*

The United States Supreme Court has recently reaffirmed that "[t]he Fourth Amendment test for a valid consent search is that the consent be voluntary," and emphasized once again that " '[v]oluntariness *is a question of fact to be determined from all the circumstances.' "* *Robinette,* —— U.S. at ——, 117 S.Ct. at 421 (quoting *Schneckloth,*

412 U.S. at 248–49, 93 S.Ct. at 2059) (emphasis added). Although the proper standard of review for so-called "mixed questions of law and fact" has been the subject of considerable recent debate (see *United States v. Yusuff,* 96 F.3d 982, 988 (7th Cir.1996)), there is no similar debate over the proper standard for questions of fact, which are reviewed for *clear error.* The recent decision in *Robinette* leaves no doubt that the Supreme Court considers the voluntariness of a consent to search a *factual* question. *See also Navarro,* 90 F.3d at 1256 ("[u]nder the established law of this circuit, we review the question of voluntariness of a consent to search for *clear error.*"). The trial court's determination that the consent to search was voluntary is a factual finding and may only be overturned if clearly erroneous. *Stribling,* 94 F.3d at 324.

Under the clear error standard, described by the United States Supreme Court as *"significantly deferential,"* Concrete Pipe & Prods., Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 622–23, 113 S.Ct. 2264, 2279–80, 124 L.Ed.2d 539 (1993), this court will only reverse a finding when, based *"on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed."* Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). This means that even if we appellate judges have misgivings or concerns about the district court's findings, i.e., *even if we would have decided the issue differently, we still must uphold those findings if they find support in the record. Id. To state it another way, we are not asked if in our opinion the defendants voluntarily consented to the search, but rather whether the district court's findings to this effect rose to the level of clear error.* This distinction is the *very essence of clear-error review,* and can often mean the difference between affirming and reversing the district court. We ought not forget that the trial judge—and not this appellate panel—is the *trier of fact,* and that we are not as well positioned as the trial court to make factual determinations, for we have before us nothing but the *"cold pages of a transcript."* United States v. Lakich, 23 F.3d 1203, 1210–11 (7th Cir.1994). As the author of today's majority opinion observed recently, applying

the clear error standard, "we give special deference to the district court's findings of fact [following a suppression hearing] because of its opportunity to observe witnesses and hear testimony on the issue." *United States v. Webb,* 83 F.3d 913, 916 (7th Cir. 1996).

### 2. *The District Court's Voluntariness Finding*

I do not agree that the trial court committed clear error in its assessment of all the facts and circumstances surrounding the encounter between the officers and the defendants, and would affirm its finding that the initial entry of the officers as well as the subsequent search of the room and luggage were both voluntary and consensual. As discussed below, the *uncontradicted* testimony at the evidentiary hearing establishes that Officers Hurrle and Lent neither engaged in the use of intimidating words or gestures, nor did they threaten the defendants, display their weapons before placing the defendants under arrest, or otherwise pressure the defendants either to admit them into the room or to acquiesce in the subsequent search of the room and the luggage. Additionally, the record clearly demonstrates that the defendants' behavior was most cooperative and congenial and that their actions throughout the entire encounter could best be described as voluntary (although, as noted previously, the defendants were eventually "seized" when the officers arrested them, this occurred only after the officers discovered the three kilograms of cocaine, and the defendants claimed to be visiting "relatives" in Milwaukee while refusing to disclose the identities of these individuals, and after the detectives had observed a marijuana cigarette lying atop a T.V. set in plain view).

The majority, again without support in the record, reaches out to chastise the officers, asserting that their decision to approach Jerez and Solis for "interrogation" "had a quality of purposefulness" and was "calculated to cause surprise, fright and confusion." Maj. op. at 695 (quoting *Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975)). This gratuitous bit of reverse appellate fact-finding (even if I were to agree

with it, which I do not) is both legally irrelevant and contradictory of the testimony in the record. It is legally irrelevant because the proper inquiry is whether the officers' conduct was (objectively speaking) so intimidating that Jerez and Solis were incapable of giving voluntary consent to the search of the room. *See Whren v. United States,* —— U.S. ——, ——, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) *("constitutional reasonableness of traffic stops [does not] depend[ ] on the actual motivations of the individual [police] officers involved.").* Furthermore, while the majority improperly asserts that the officers intended to cause "surprise, fright, and confusion," this characterization is contradicted by the testimony of Officer Lent, who made clear that he and his partner identified themselves as officers of the law and proceeded in a straightforward fashion, as law enforcement officers should, rather than use any intimidating tactics, subterfuge or trickery. It is important to note that these dedicated officers, chastised by the majority, could have adopted a far more subtle strategy for ferreting out the cocaine than the option they chose (seeking the defendants' voluntary consent to search after knocking on their door). The officers could have set up a stake-out and waited for the defendants to emerge from the motel room and drive off in the Honda to deliver the cocaine. Armed with the information that they had in their possession, the officers could then have pulled the defendants over for operating a motor vehicle without a valid driver's license and searched the vehicle. *See* Wis. Stat. Ann. § 345.22 ("A person may be arrested without a warrant for the violation of a traffic regulation if the traffic officer · has reasonable grounds to believe that the person is violating or has violated a traffic regulation."); *see also* Wis. Stat. Ann. § 343.05 (traffic regulation requiring valid driver's license in order to operate a motor vehicle on Wisconsin highways).

The detectives were indeed "purposeful," as the majority asserts, but their purpose was legitimate: to obtain a valid search. The majority's claim that the officers had some other, improper purpose (i.e., to cause "surprise, fright, and confusion") is belied by the record. Even if I were to agree with the

majority's unwarranted conclusion that the officers set out to intimidate the defendants, I fail to understand how the defendants could *actually* have been frightened or confused under the circumstances, for the officers merely knocked on the door (as a motel employee or anyone else might have done) and were careful to identify themselves as police officers when they knocked.

The appellate majority finds that due to the allegedly "late" hour of the search and the officers' repeated knocking the defendants "were not in a position to freely and voluntarily deny the detectives' requests for searches." My review of the evidentiary hearing transcript convinces me that the resident judges' application of the totality of the circumstances test required by case law was proper and that the defendants *did* voluntarily consent to both the entry into their motel room as well as the subsequent search. Under the clearly erroneous standard, *"if the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511. I am convinced that the district court adopted a plausible—indeed, an amply supported—view of the evidence and therefore should be affirmed under the clearly erroneous standard. *United States v. McDonald,* 22 F.3d 139, 144 (7th Cir.1994) ("If two permissible views exist, the factfinder's choice between them cannot be clearly erroneous.") (citing *Anderson* ).

In assessing the "totality of the circumstances" surrounding the search of the defendants' motel room, the experienced magistrate judge, and in turn the experienced and knowledgeable trial judge, chose to rely upon the detectives' convincing—and uncontradicted—testimony. Under oath, both Officers Hurrle and Lent made clear to the court through their testimony (including thorough cross-examination) that their behavior on the night of September 26, 1994 was non-coercive. In testimony that lacked any significant discrepancies, each stated under oath that *before* being admitted to the

motel room they: (1) knocked on the door and window in a normal fashion, (2) identified themselves as police officers, and (3) in a conversational tone, sought an opportunity to speak with the defendants. Hurrle and Lent also testified that the defendants were cooperative and that they repeatedly made clear their intention to consent, using various words and gestures, as set forth in this decision. Lent testified that Solis *"welcomed" the officers into the room with "no hesitation."* The officers testified that the defendants remained cooperative *throughout* the encounter, that they invited the officers' entry into the room for questioning, and furthermore that they consented to the search of their room and their luggage. During the entire encounter, there were no voices raised, much less any threats or angry words, nor was there a scuffle of any kind. The testimony of the Detectives concerning the consensual nature of the search, in addition to being mutually corroborating, withstood defense counsel's rigorous and thorough cross-examination. Although counsel for Jerez *speculated* that the officers were determined to obtain a consent search and that they refused to "take no for an answer" (a sentiment echoed by the majority opinion), the defense failed to introduce a scintilla of evidence, much less testimony, in support of their self-serving, speculative theory.[13] Not surprisingly, the magistrate judge (and, ultimately, the trial judge as well) found the only testimony in the record—the officers' uncontradicted and unchallenged version of events—to be credible. Later, the district court stated that "[b]ased on the *uncontradicted* testimony of the two police officers and the magistrate's findings based on their *credibility*," the search of the motel room "was pursuant to the defendants' *voluntary consent*." (emphasis added).[14] The district court's determination rested upon its assessment of the totality of the facts and circumstances surrounding the consent search, an assessment which in turn was based upon the testimony of the two Detectives. As noted, the officers' testimony was neither cast into doubt by the defense counsel's cross-examination nor contradicted with other evidence at the evidentiary hearing and thus became a verity. As amply reflected in our case law, members of this or any appellate court do not have the authority to second-guess findings of this nature, much less act as a super-jury and substitute their findings of fact for those of the experienced resident judges (magistrate and trial) in this case. While we as appellate judges are limited to the "cold pages of a transcript," as mentioned, *the fact-finder had the opportunity to observe face-to-face and to evaluate the witnesses' "verbal and non-verbal behavior," including "reactions and responses to ... interrogatories, ... facial expressions, attitudes, tone of voice, eye contact, [and] posture and body movements." Lakich,* 23 F.3d at 1210–11 (emphasis added, quotation omitted). As previously noted, in *Ornelas,* a case which also arose in Milwaukee County, Wisconsin, the United States Supreme Court commented that reviewing courts should "take care both to review findings of historical fact only for clear error and *give due weight to inferences drawn from [the] facts by resident judges and local law enforcement officers.*" —— U.S. at ——, 116 S.Ct. at 1663. The magistrate judge and the district judge responsible for making the factual findings in this case are longtime residents of Milwaukee County and are familiar with the drug-trafficking problem that manifests itself in and around certain local transportation hubs, including the airport. Just as the law enforcement officers involved in this case were most experienced (as the Supreme Court observed with respect to Officer Hurrle in *Ornelas*), the magistrate judge and trial judge brought to their task a wealth of common sense and judicial and legal experience. As Judge Duniway of the

---

**13.** The defendants did introduce photographs of the motel room at the evidentiary hearing, for reasons unexplained in the record.

**14.** A district judge is required to make *de novo* determinations with respect to disputed aspects of a magistrate judge's findings and recommendations. 28 U.S.C. § 636(c)(4). However, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge," *Id.,* without conducting an additional hearing. *United States v. Raddatz,* 447 U.S. 667, 674, 100 S.Ct. 2406, 2411, 65 L.Ed.2d 424 (1980).

Ninth Circuit reminded us some years ago (in a case cited by the majority):

> [I]t is the trial judge who hears the witnesses and who must pass on their credibility. We sometimes tend to forget that the testimony of a witness, presented to us in a cold record, may make an impression upon us directly contrary to that which we would have received had we seen and heard the witness. It ought not to be assumed that United States District Judges [or Magistrate Judges] are any less determined to preserve constitutional rights than we are. They, too, are sworn to uphold the Constitution. That they do, in fact, take seriously their obligations to protect the constitutional rights of defendants in cases such as this is demonstrated by the many reported opinions in which they have dealt with such questions.

*United States v. Page,* 302 F.2d 81, 84 (9th Cir.1962).

Wisely, Solis and Jerez have not, at any time, attacked the credibility of Officers Hurrle and/or Lent, nor do they suggest, on appeal, that reliance on their uncontradicted testimony was improper. Lacking support in the record, Solis and Jerez instead journey into that wonderful and beautiful valley of speculation (followed by the majority), arguing that they were somehow confronted with an *inherently* coercive situation. In other words, the defendants go so far as to argue that no reasonable person would feel free to give his voluntary consent to a law enforcement officer who knocks on his motel or hotel room door at night. In the eyes of the appellants and the majority, the allegedly late hour and the officers' repeated knocking made the situation so intimidating that the defendants (despite being secure behind a locked door with a telephone for help at their disposal) had no alternative but to admit the officers into the room and consent to the search of their room and luggage.[15]

I reject this argument because it *ignores common sense, the record before us and the factually-based "totality of the circumstances" test mandated in our case law.* "It is only by carefully analyzing all the circumstances of an *individual* consent that it can be ascertained whether *in fact* it was voluntary or coerced." *Schneckloth,* 412 U.S. at 233, 93 S.Ct. at 2050 (emphasis added). Because the voluntariness of a consent to search is a factual question to be determined by the factfinder "from the totality of *all* the circumstances," *Id.,* it is improper to consider particular factors in *isolation* or to give these particular factors undue weight. As the United States Supreme Court observed recently, "every Fourth Amendment case, since it turns upon a 'reasonableness' determination, involves a balancing of *all* relevant factors." *Whren,* —— U.S. at ——, 116 S.Ct. at 1776 (emphasis added); *see also United States v. LaGrone,* 43 F.3d 332, 334 (7th Cir.1994); *United States v. Chaidez,* 919 F.2d 1193, 1197 (7th Cir.1990) ("reasonableness is ... the ultimate standard"). I am convinced that the magistrate judge and district judge properly concluded, based upon the *totality of the circumstances,* that the defendants' consent was voluntary. It is improper for the appellate-court majority to subvert the factual findings of these resident judges by focusing on but two isolated and inconsequential factors: (1) the timing of the defendants' encounter with the officers (nighttime) and (2) the officers' knocking more than once. This narrow and limited approach fails to apply the *totality of the circumstances* test, as our case law mandates.

Disregarding the facts in the record, which establish that Solis and Jerez consented to the officers' entry as well as their subsequent search of the motel room at *11:10 PM,* shortly after the defendants had returned to their motel room, the majority rather melodramatically attempts to portray this as a case in which law enforcement officers brusquely roused the defendants from sleep in "the

---

**15.** It is by no means an unusual occurrence for a traveler residing at a busy hotel or motel to have his door knocked upon during the nighttime hours, even at 11:00 PM. Moreover, as discussed below, the argument that the defendants lacked any alternatives in their situation is untenable. The defendants had available to them a range of options, such as using the room telephone to call the front desk to complain or simply ignoring the officers, but instead they chose to open the door and "welcome" the officers into the room and permit the search of the room as well as their belongings.

middle of the night" or, even more ominously, "the dead of night." Maj. op. at 690–91. In order to characterize this case in an *exaggerated fashion*, the majority relies primarily upon inapposite case law from some thirty-five or forty years ago (selectively quoted), while inexcusably disregarding the factual record before us.

Certainly I do not take issue with the general proposition that an after-dark search *may* be more intimidating than one which occurs on a beautiful, bright, sunlit day, particularly if law enforcement officials abruptly awaken a citizen from sleep or otherwise engage in intimidating conduct.[16] *See, e.g.,* LaFave, 2 *Search and Seizure* § 4.7(b) (3rd ed. 1996). However, I have been unable to discover any case law stating that searches or door-knocking during the night by law enforcement officers are *per se* invalid. Moreover, I am of the opinion that the cases cited by the majority are inapposite. For example, my colleagues cite, not a majority opinion, but a *dissenting* opinion in *Monroe v. Pape*, 365 U.S. 167, 210, 81 S.Ct. 473, 496, 5 L.Ed.2d 492 (1961), a case some thirty-five years old, for the proposition that nighttime encounters with the police are "especially intrusive" and therefore particularly suspect under the Fourth Amendment. However, the majority quotes selectively from Justice

Frankfurter's dissenting opinion in *Monroe* to suggest that it was the *timing* of the search at night that Justice Frankfurter considered most "evil." In fact, as Justice Frankfurter made very clear, the law enforcement officials in *Monroe* engaged in a veritable laundry list of degrading and intimidating conduct which, under the totality of the circumstances, combined to make the search unreasonable. *Monroe*, like the instant case, took place at night. However, the similarities between *Monroe* and this case end there. Unlike the instant case, *Monroe also* involved:

> *intrusion en masse ... by force*, unauthorized by warrant, into an occupied private home, without even the asserted justification of belief by the intruders that the inhabitants were presently committing some criminal act within; *physical abuse* and the calculated *degradation of insult and forced nakedness; sacking and disordering of personal effects* throughout the home; arrest and detention against the background terror of threatened criminal proceedings.

*Id.* (emphasis added). The remaining cases cited by the majority, like *Monroe*, are distinguishable from the instant case and fall short of establishing that nighttime searches are *per se* invalid.[17] These cases assert that

---

**16.** As discussed below, based on the record there is no reason to conclude that the defendants were sleeping when the officers knocked on their motel room door.

**17.** My distinguished colleagues rely on *Frank v. Maryland*, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959), in which the Supreme Court made nothing but a passing reference to "midnight" searches and did not even come close to holding such searches invalid per se. Similarly, the majority cites another case from almost forty years ago, *Jones v. United States*, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958), which involved a warrantless nighttime search that was, in *sharp contrast* to the search at issue here, not even *arguably consensual. Id.* at 495, 78 S.Ct. at 1255. In *Jones*, the defendant by no means invited the entry of law enforcement officers, as Solis and Jerez did in this case; indeed, to the contrary, *the defendant's wife in Jones attempted, though futilely, to block the entry of federal officials, and placed her arms across the door and demanded to see their search warrant. Jones* and the instant case are as different as sunshine and rain. The majority also invokes two circuit-court opinions that I consider unpersuasive: the First

Circuit's opinion in *United States v. Young*, 877 F.2d 1099 (1st Cir.1989) and the Second Circuit's opinion in *United States v. Ravich*, 421 F.2d 1196 (2d Cir.1970). In *Young*, the police had a warrant directing them to conduct a search during the daytime hours, and, although the search commenced during daylight, it continued into the nighttime. The court failed to rule the search invalid, noting (as is also true of the instant case) the "absence of evidence showing special inconvenience to residents," i.e., the absence of any evidence showing an *"abrupt* intrusion[] on *sleeping* residents in the dark...."* 877 F.2d at 1104–05. In *Ravich*, similarly, the Second Circuit *upheld* the search of a motel room conducted, during the nighttime, but pursuant to a warrant which designated the hours of the allowable search in the daytime. 421 F.2d at 1200. As the real issue in the case was whether the warrant could legitimately be executed during the nighttime, the question of voluntary consent was not even before the court (the occupants of the motel room were elsewhere when the search was conducted). The *Ravich* court alluded to the "peculiar abrasiveness" of nighttime searches *generally*, but after a thorough and

the *timing* of a search *may*, at best, *only contribute to* the unreasonableness of a given search *when considered with all of the other factors under the totality of the circumstances test.*

A more fundamental problem with the majority's analysis is its characterization of the facts in this case, i.e., its depiction of the defendants being "awakened" or "rouse[d] out of bed" in the "middle of the night." The officers knocked on Solis' and Jerez' motel room door at approximately 11:10 PM, shortly after the defendants had returned to the motel. The appellants have argued (I think incorrectly) that it is "unusual" to hear a knock on one's motel room door at such an hour, but the majority goes well beyond this in its attempt to establish that a constitutional violation occurred. The majority inaccurately but repeatedly mischaracterizes 11:10 PM as "the middle of the night" and, even more dramatically, "the dead of night." The dictionary refers to the "middle of the night" as "12 o'clock at night" (i.e., nearly an hour after the officers knocked). *The American Heritage Dictionary* (2d College Edition 1982). Of course, the phrase "middle of the night" is often used to describe an hour much later than midnight. *See, e.g., United States v. Granderson,* 511 U.S. 39, 52 n. 9, 114 S.Ct. 1259, 1266 n. 9, 127 L.Ed.2d 611 (1994) (congressional legislation was debated at 2:20 AM, a time described by the Court as "the middle of the night"). As the author of the majority opinion recognized in *Bergren,* 811 F.2d 1139, a case less than ten years old, the term *"dead* of night" (which the majority uses herein) refers in common understanding to an even *later* period of time than midnight. *Bergren* involved police questioning of a juvenile which occurred between 2:00 and 2:30 AM, and in *Bergren* my respected colleague, the author of today's majority opinion, quoted a Supreme Court opinion which properly referred to the hours between midnight and 5:00 AM as "the dead of night." *Id.* at 1143

n. 3 (quoting *Haley v. Ohio,* 332 U.S. 596, 599–600, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948)). Similarly, in *Wilson,* 2 F.3d at 232, my colleague described a time frame *after* 1:00 AM as "the dead of night." The majority's dramatic description of 11:10 PM as "the middle of the night" or "the dead of night" conveniently shifts the meaning of those terms backwards in time, for reasons obvious, thus contravening both common understanding and Seventh Circuit case law.

It is also important to remember that terms such as "middle of the night" and "dead of night" are relative. There are those people who retire quite early in the evening (e.g., 7 or 8 PM) and for them, 11:10 PM could perhaps be described as "the middle of the night." Many others do not retire for the evening until much later. For the many individuals who do retire late, the *middle* of the night is obviously sometime well after 12:00 AM. It should be clear, therefore, that "the middle of the night," like beauty, is in the eye of the beholder. As noted, the "dead of night," in common understanding, implies an extremely late hour (perhaps between midnight and 5:00 AM) when the majority of people have retired for the night and are asleep.[18] A careful examination of the record establishes that the police did not knock on the defendants' motel room door either in the "dead of night" or in the "middle of the night," *relative to the time when the defendants retired for the evening.* Detective Lent testified that he and Hurrle knocked on the door of Room 161 at approximately 11:10 PM. The parking lot had been under surveillance (because of the defendants' suspected drug courier activity) from approximately 8:30 PM until 10:45 PM, but there was no sign of the defendants' white Honda on the premises during this time frame. The defendants returned to the motel sometime between 10:45 PM and the time Officer Lent spotted the Honda shortly after 11:00 PM on September 26, 1994. Thus, they were in the

proper consideration of *all* of the facts in the case, the court went on to uphold the search. *Id.* In sum, each of the cases cited by the majority are factually distinguishable from the instant case and fall short of establishing that nighttime searches are *per se* invalid.

18. Blackstone, discussing the common-law crime of burglary, referred to the "dead of night" as the time of night when "all the creation, except beasts of prey, are at rest; when sleep has disarmed the owner, and rendered his castle defenceless." 4 W. Blackstone, *Commentaries on the Laws of England* 224.

motel room for, *at most,* twenty five minutes before the officers arrived at the door (although it would be improper to speculate, it is obvious that they might easily have been in the room for an even shorter period of time). Because Solis and Jerez had been "out and about" in Solis' car until shortly before the officers' arrival, it is clearly misleading to refer to the officers' knocking on the door at 11:10 PM as "the middle of the night" or the "dead of night" *for the defendants.*

Finally, I observe that terms such as "nighttime search" and "the middle of the night," used so liberally by the majority, are, at best, considered as fluid and changing concepts in a historical sense. What was widely considered "the middle of the night" even a generation ago, when Justice Frankfurter wrote his dissenting opinion in *Monroe,* 365 U.S. at 210, 81 S.Ct. at 496, may not be so today.[19]

By focusing on the alleged lateness of the hour, my colleagues seem to want this court to establish a magical bright-line "witching hour," after which contact between law enforcement officers and citizens is deemed constitutionally suspect under the Fourth Amendment. I ask: "Is that hour 8:00 PM? 9:00 PM? 10:00 PM? 10:30 PM? 11:00 PM, Midnight, or later?" Is the magical Fourth Amendment "witching hour" the same in the Eastern Time Zone (Indiana) as in the Central Time Zone (Wisconsin, Illinois)? If the bright-line "witching hour" is, let us say, 11:00 PM, are police-citizen encounters which occur at 10:59 PM valid, while those which occur at 11:01 PM are invalid? Pinpointing a particular time of night and designating that hour as "late" runs counter to the "totality of the circumstances" approach, and ignores the obvious reality that what is "late" in the evening for some of us is not necessarily "late" in all situations and for all persons. I am of the opinion that the majority's approach, which assumes the existence of a magical "witching hour," will only serve to cast a new cloud of confusion and disarray over the law of search and seizure.

Having established—on the facts of this case—that it was neither *"the middle of the night"* nor the *"dead of night"* when the officers knocked, as the majority contends, I next address the assertion that Solis and Jerez were asleep when the knock came. The majority speculates that Solis and Jerez were asleep at the time of the officers' initial knock. As previously mentioned, the record reflects that the defendants had been in their room quite possibly for as little as 10 or 15 minutes, when the officers arrived. In light of the time it takes most people to prepare for bed, it is highly unlikely that the defendants were asleep. Furthermore, when Solis invited the officers to enter the room, he was fresh and alert; not disoriented, as one would expect if he had been abruptly awakened from a sound sleep. In short, the facts set forth in the record belie the majority's speculation that the defendants were sleeping and "rouse[d] out of bed" by Detectives Hurrle and Lent knocking on their motel room door.

The Fourth Amendment is a constitutional guarantee of great importance, and the majority's desire to be faithful to that guarantee is commendable, but the Fourth Amendment does not license this court to engage in appellate factfinding. I do not agree with the majority that stricter Fourth Amendment scrutiny is proper as applied to my colleagues' unsupported factual portrayal (an alleged "seizure") of this case as being one where law enforcement officers intruded on the peace and quiet of sleeping individuals. The majority continues on and proceeds to castigate the officers and accuse them of being overzealous and insensitive, based on its own creative fact-finding that the officers were determined to cause "surprise, fright, and confusion." The majority's assumptions and findings of fact are contradicted by the only testimony in the record: that of the officers that they hoped to obtain a consensual search, as they had experienced many times in the past. By proceeding on unwarranted assumptions, the majority does a disservice to these dedicated officers, who were fulfilling their oath to protect the public by

---

**19.** Changes in our way of life, brought about by television, movies, radio, and other technological advances during the past thirty-five or forty years, include dramatic changes in our living, and our waking and sleeping hours.

investigating the possible entry of illegal narcotics into Milwaukee County. It is not our role as appellate judges to create a constitutional error based upon such unfounded assumptions, or to advance new theories without precedential support. Rather, we are to search for the *truth* after a fair and thorough consideration of the record *in its entirety.* The record demonstrates that the officers in this case obtained the defendants' voluntary consent to enter and search the motel room without resorting to improper intimidation tactics or deception. By giving their consent, the defendants surrendered any privacy interests that they may have had in either the room or the luggage, for as my colleague Judge Easterbrook has pointed out, *"the Fourth Amendment applies in the first place only to things persons seek to hold in confidence."* *Chaidez,* 919 F.2d at 1202.

When discussing the reasonableness of a warrantless Fourth Amendment entry, we consider all of the circumstances surrounding the event, including but not limited to the knock and announce statement employed by the officers in this case. *Sledd v. Linsday,* 102 F.3d 282, 287 (7th Cir.1996) (citing *Wilson v. Arkansas,* — U.S. ——, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995)). The officers knocked on the defendants' motel room door and window and clearly identified themselves as deputy sheriffs before being admitted, in keeping with the practice of "knocking and announcing." Just how did the brief period of off-and-on knocking affect the defendants' ability to give their voluntary consent to the search of the motel room, if at all? First, I observe that the officers neither "banged" nor "pounded" on the securely locked door, nor did they rap continuously. Rather, the record establishes that for a period of several (3) minutes, the officers knocked *intermittently* and, in Hurrle's words, "normally" on the door, receiving no response. Far from issuing "commands," as the majority states, Hurrle and Lent mildly requested Solis to open the door and answer some questions. Among the options available to Solis and Jerez were to (a) ignore the officers altogether, (b) state through the door that they did not wish to speak to the officers, (c) report to the motel's front desk that they were being disturbed, or (d) turn up the television or

radio. The defendants chose none of these options, which lends further credence to the trial court's finding that they willingly and voluntarily permitted the officers to enter. According to the testimony of both Hurrle and Lent, Solis verbally invited them to "come in," gesturing that they were free to enter. I observe that if the defendants had truly felt intimidated and afraid, as they now assert, they would most likely have chosen a *modus operandi* frequently employed by drug purveyors in similar situations; namely, that of flushing the contraband drugs down the toilet. Obviously, without a warrant, the officers were powerless to enter the room.

The majority, once again substituting its own fact-finding for that of the magistrate and trial judges, reaches out and without legal support asserts that the defendants' short period of silence in response to the detectives' knocking and self-identification must be interpreted as *"a refusal by Mr. Jerez and Mr. Solis to answer the door."* I do not agree that the defendants' short period of silence *must* be construed as meaning *"Go away,"* as the majority contends, nor is there any case law mandating such a conclusion.

I am aware of cases describing the concept of "constructive refusal," i.e., the idea that silence in response to a law officer's knock should be construed as a refusal of admittance. *United States v. Ramos,* 923 F.2d 1346, 1356 (9th Cir.1991); *United States v. Wood,* 879 F.2d 927, 932–33 (D.C.Cir.1989); *United States v. Jefferson,* 714 F.2d 689, 693–94 (7th Cir.1983). However, the "constructive refusal" cases referred to above, Maj. Op. at 691, are distinguishable because they typically involve the question of *when a federal official is justified in executing a forcible entry for the purpose of serving a search warrant under 18 U.S.C. § 3109.* In the instant case, by contrast, the officers had no warrant and lacked authority to make an entry in the event that Solis and Jerez had continued to remain silent (thus, if the defendants had simply ignored the officers, this case would not be before us today). I see no reason why we should inject the "constructive refusal" concept, which was developed in an entirely different context, into the law of

voluntary consent searches. Limiting strictures and bright-line rules of this sort would be inconsistent with existing precedent, which properly affords the fact-finder a reasonable measure of breathing space in determining whether, under the totality of the circumstances, consent was voluntary.

"When evaluating whether a consent to search was voluntary, the court should determine whether a defendant's will was overborne by the police actions." *Yusuff,* 96 F.3d at 985. The record fails to support, much less compel, the conclusion that the nighttime knocking by Hurrle and Lent was so intimidating and coercive that it overpowered the defendants' free will and thus their ability to consent to the search of the motel room. The uncontradicted testimony of the officers establishes that the defendants gave their consent to *both* the officers' entry into the room and their subsequent search, displaying a pattern of cooperation and voluntariness which belies the assertion that they were acting out of fear or intimidation. Understandably, my colleagues in the majority, like the appellants, pay little attention to this most important part of the record. Instead of challenging the officers' testimony that the defendants voluntarily consented to their entry as well as the search of the room, the appellants come up with a new twist and argue, improperly, that their statements and gestures to the officers ought not to be considered *at all* because, in the words of defense counsel at oral argument, these manifestations of consent followed "outrageous" conduct [20] that was aimed at "priming" the defendants to give their consent. Perhaps the appellants are attempting to invoke the so-called "outrageous government conduct doctrine," i.e., the notion that "the conduct of law enforcement officers is so outrageous that due process principles ... absolutely bar the government" from prosecuting the case. *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). If so, they are on very shaky ground, for "both a plurality of the Supreme Court and this circuit have expressed doubt as to the validity of the doctrine of outrageous conduct." *United States v. Davis,* 15 F.3d 1393, 1415 (7th Cir.1994). If the doctrine exists at all, it represents, at best, "an extremely narrow opportunity for a defendant to challenge government conduct violating his due process rights." *Id.* In rejecting this doctrine, my colleague Judge Easterbrook once commented:

> Our court has never reversed a conviction on the basis of [the 'outrageous governmental conduct'] defense and has questioned language looking favorably upon it. When push comes to shove, we should reject the contention that the criminal must go free because the constable was too zealous. Why raise false hopes? Why waste litigants' and judges' time searching for and rejecting on the facts defenses that ought not exist as a matter of law? Everyone has better things to do.

*United States v. Miller,* 891 F.2d 1265, 1271 (7th Cir.1989) (Easterbrook, J., concurring).

In my view, the uncontradicted testimony of Hurrle and Lent establishes that (a) the officers' polite and measured conduct was far from "outrageous," and (b) the defendants' consent was not coerced but voluntary and consensual *throughout* the encounter. For example, Lent testified that Solis seemed very much at ease when he opened the door, and exhibited "no hesitation" when he invited the officers to enter the room. This hardly seems like the demeanor of someone who has just been intimidated by the aggressive tactics of law enforcement officers "refusing to take no for an answer." Evidence pertaining to the defendants' demeanor at the time of the encounter is obviously relevant to the issue of coercion (or lack thereof), and for this reason it was properly considered by the factfinder as one aspect of the "totality of the circumstances." Had the record contained even a scintilla of evidence that the defendants displayed any fear, anxiety, nervousness, anger, or distress while welcoming the officers into the room, such evidence *might* permit a guarded inference that their consent to the initial entry was in fact less than voluntary. However, the record is devoid of any such evidence. I also think it most significant that the defendants *continued* to manifest their cooperation and consent, not

---

**20.** The officers' knocking on the door and window at night.

only during the officers' entry, but also during the ensuing search of their room and luggage. There is absolutely no evidence in this record that the defendants, at any time, attempted to restrict or limit the scope of their consent to search. *See Stribling,* 94 F.3d at 324 ("[defendant] was present during the search; she could (and should) have protested at the time if she believed [the officer] exceeded the scope of her consent, as it was her burden to limit that scope.").

. The usual case in which consent to enter and/or search is deemed *in*voluntary involves factors that were not present in the instant case, such as (1) lack of mental capacity, (2) inability to understand English, (3) physical force or threats, (4) the display of weapons, or (5) repeated or lengthy questioning. Some of these factors, for example, were present in *United States v. Novak,* 870 F.2d 1345 (7th Cir.1989), which is cited by the majority. In *Novak,* this court held that an encounter was involuntary where the defendant, who spoke English "halting[ly]," was accosted by between six and nine officers, some with their weapons drawn, and escorted to an office some distance away. *Id.; see also United States v. Talkington,* 843 F.2d 1041 (7th Cir.1988) (consent involuntary because police had their weapons drawn, behaved in a loud and abusive fashion, lied, and threatened to conduct an unwarranted body cavity search of the defendant's wife). Because *Novak* involved intimidating factors that were completely absent in this case, I am puzzled at the majority's reliance upon this case.

For this court to hold that the defendants' consent was not voluntary in the absence of any of the intimidating factors discussed above would, at a minimum, bring disarray to our Fourth Amendment jurisprudence and create an aura of confusion that will only serve to cast a cloud over the meaning of our existing case law. More likely, it would establish a vastly and unnecessarily confusing and limited definition of the word "voluntary" as a legal term. In my view, this would hamper the ability of law enforcement officials to investigate criminal activity by approaching citizens in good faith, as Detectives Hurrle and Lent were able to do through good police work and without the use of intimidation, force, or trickery.

Until today, this court has consistently applied the clear error standard of review in cases such as this, because we have recognized that the voluntariness inquiry "is factually based and requires that we give particular deference to the district court," which "had the opportunity to hear the testimony and observe the demeanor of the witnesses." *Dickerson,* 975 F.2d at 1249; *see also United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir.1990). Under the clear error standard,[21] the members of this panel must be concerned—not with whether we would have ruled the same way as the trial judge—but *with whether "the district court's account of the evidence is plausible in light of the record viewed in its entirety." Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511 (emphasis added).

In view of the totality of the circumstances, I refuse to hold that the mere fact that the entry and subsequent search took place at 11:10 PM, or the fact that the officers knocked intermittently for a brief period, created an inherently coercive environment in which Solis and Jerez were incapable of giving their voluntary consent to the search. Because the record is replete with evidence establishing that consent was voluntary, I am of the opinion that under the clear error standard this court must affirm the district court's finding that the search was not in violation of the Fourth Amendment.

## IV. CONCLUSION

For a law enforcement officer's actions to be held in violation of the Fourth Amendment, those actions must do more than merely "offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically." *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) (Frankfurter, J.). As this court and the United States Supreme

---

**21.** As discussed above, I do not believe that the Supreme Court's recent decision in *Ornelas,* —— U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911, does away with the existing, deferential standard of review for voluntariness determinations. See also *Robinette,* —— U.S. at ——, 117 S.Ct. at 417.

Court have repeatedly emphasized, the Fourth Amendment does not prohibit *all* searches and seizures initiated by law enforcement officers, but only those searches that are unreasonable. *Dorsey,* 27 F.3d at 290; *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446–47, 4 L.Ed.2d 1669 (1960). "The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent *arbitrary and oppressive* interference by enforcement officials with the privacy and personal security of individuals.'" *United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). As a respected scholar has observed, the Amendment was never intended by the Framers to subvert the process by which we apprehend and prosecute criminals. Akhil Reed Amar, *Fourth Amendment First Principles,* 107 Harv.L.Rev. 757 (1994) (exclusionary rule for Fourth Amendment violations is incompatible with the original intent of the Framers).

Furthermore, I observe that this case involves narcotics trafficking, and that neither the magistrate, the trial judge, nor the members of this panel "operate in a vacuum, shielded from knowledge of drug operations in the real world." *United States v. Perry,* 747 F.2d 1165, 1169 (7th Cir.1984). While we as judges must vigorously protect an individual's constitutional rights, including those guaranteed by the Fourth Amendment, we must not wear blindfolds and disregard the ever-growing "cancer of drugs on humanity," *United States v. Tolson,* 988 F.2d 1494, 1505 (7th Cir.1993), or ignore the potential impact our decisions have on the good-faith efforts of law enforcement officials to eradicate that cancer. Once we don our judicial robes, we are not expected to cast aside our knowledge and experience of the everyday affairs of life.

I am mindful that general Fourth Amendment principles and concern for individual rights must guide our decision, and I believe that affirming the district court is fully consistent with those principles. I am also of the opinion that if we are to be faithful to the applicable "clearly erroneous" standard of review, a fair reading of the record in its entirety, together with the reasonable inferences therefrom, requires us to affirm the district court's factual finding that the defendants consented to the search of their motel room.

The majority's assertions that Solis and Jerez were (1) awakened from sleep (2) in the "dead of night" disregard the record (which, as I have observed, consists almost entirely of the unchallenged and uncontradicted testimony of the officers). In effect, the appellate majority holds that the only testimony in the record, that of the officers, is unworthy of credence. I understand that in order to reach out and find a constitutional violation in this case, my colleagues must cast aside this testimony. I believe that by taking this approach the majority misapplies both the clear error standard of review and the "totality of the circumstances" test, a flexible, common-sense analysis under which a "determination of voluntariness does not ride on the presence or absence of a single controlling factor." *LaGrone,* 43 F.3d at 334. Remanding the case, with the analysis provided by the majority, would be the functional equivalent of instructing the factfinder to (a) ignore key aspects of the record and, (b) find that the defendants' consent was not voluntary by focusing on particular and isolated factors in the record. Such a course is inconsistent with both the totality of the circumstances test and the clear error standard of review. Because the record supports a finding that the search of the defendants' motel room was voluntary and consensual, I refuse to join the majority's decision to remand this case for further proceedings. In my view, the district court's ruling to deny the defendants' motions to suppress should be AFFIRMED.